Sharon SHERMAN, Appellant,

v.

PELLA CORPORATION f/k/a Rolscreen
Company, Appellee.

No. 96–1231.

Supreme Court of Iowa.

March 25, 1998.

Philip F. Miller, West Des Moines, for appellant.

D. Brian Scieszinski and Michael L. Mock of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

Sharon Sherman appeals from a district court order affirming the industrial commissioner's award for scheduled injuries pursuant to Iowa Code section 85.34(2) (1995). She challenges Iowa's scheduled injury system on constitutional grounds. She also takes issue with the commissioner's refusal to award her disability benefits for unscheduled injuries, claiming that substantial evidence does not support the refusal. In addition, she claims the commissioner erred in determining her benefits. We affirm on all issues.

### I. *Facts.*

Apart from a two-year hiatus in the late 1970s, Sharon Sherman has, since 1972, worked exclusively for Pella Corporation or its predecessor, Rolscreen. She works there today, earning the most she has ever earned with the company.

For the past thirteen years, Sherman has suffered severe headaches. In the early 1990s, wrist and elbow pain also began to plague her. In October 1992, Dr. Scott B. Neff, an orthopaedic surgeon, diagnosed her condition as carpal and cubital tunnel syndrome in both right and left arms. In December 1992 and January 1993, Neff performed surgery on both arms. Although her condition improved somewhat, she now complains of debilitating pain in her wrists, arms, shoulder, neck, and head.

In June 1993, Sherman returned to Neff. Over time, he performed various tests to assess Sherman's condition. Neff determined that Sherman suffered some residual effects of carpal tunnel syndrome in her right arm but that her left arm had healed. Based on the tests he performed, Neff could find no objective proof to explain the cause of Sherman's pain. In particular, one of the tests showed no signs of claudication, a manifestation of thoracic outlet syndrome.

Sherman, however, still believed her suffering was work-related and entitled her to

workers' compensation benefits. On July 8 Neff referred her to Pamela Duffy, a physical therapist, for an impairment rating evaluation. Utilizing the *AMA Guides to the Evaluation of Permanent Impairment* (*Guides*), Duffy concluded Sherman suffered a 3% permanent partial impairment of the right hand but no impairment of the left hand or of either arm. Duffy attributed the 3% impairment of the right hand to decreased range of motion and sensory loss. Relying on the *Guides,* Neff agreed with the 3% impairment rating.

On advice of her attorney, Sherman sought treatment from Dr. Karen Kienker, a board certified specialist in physical medicine and rehabilitation. After seeing Sherman on October 1, Kienker's impression was that Sherman suffered from thoracic outlet syndrome, myofascial neck pain, and headaches which "appear to be related to her work activities." Kienker gave Sherman the following impairment rating:

> For intermittent claudication with mild upper extremity usage, she has a 70% impairment of the right upper extremity, which is the dominant upper extremity and a 63% impairment of the left upper extremity. The 70% impairment of the right upper extremity converts to a 42% impairment of the whole person. The 63% impairment of the left upper extremity converts to a 38% impairment of the whole person. Combining this gives a 64% impairment of the whole person.

Kienker suggested that Sherman might benefit from treatment for thoracic outlet syndrome.

Neff disagreed with Kienker's findings. Neff believed the objective tests he performed—which Kienker did not perform—supported his diagnosis and impairment rating.

II. *Proceedings.*

In February 1993, Sherman filed for workers' compensation benefits, and a deputy industrial commissioner heard her case in June 1994. In October, the deputy authored an arbitration decision, describing the issues this way:

The disputes deal with the duration of [Sherman's] entitlement to healing period benefits and her claim for permanent partial disability compensation. [Sherman] also seeks alternate medical care under the direction of Karen Kienker, M.D. Other issues which are presented are whether the disability is scheduled or unscheduled. [Sherman] also contends that her conditions constitute an occupational disease which should be compensated under chapter 85A. [Sherman] contends that the scheduled member system is unconstitutional.

In his decision, the deputy was highly critical of the scheduled member system. He denounced the *Guides* as arbitrary and noted that because more women than men were commonly afflicted with carpal tunnel syndrome, women were compensated unequally. However, he stopped short of holding the scheduled member injury system unconstitutional because he recognized he lacked authority to do so. *See Shell Oil Co. v. Bair,* 417 N.W.2d 425, 429–30 (Iowa 1987) (holding that administrative agency lacks authority to declare statutes unconstitutional). Instead, he concluded that the carpal tunnel and cubital tunnel syndromes were scheduled injuries and were compensable under Iowa Code section 85.34(2).

The deputy determined that Sherman suffered entrapment neuropathy and noted that the *Guides* provided the "most specific and most representative method of measuring her residual impairment." Using the *Guides,* which he had previously denounced, the deputy found that Sherman suffered a 28% loss of use of her right arm and a 19% loss of use of her left arm. He concluded that the combined loss was equivalent to a 26% impairment of the whole person under the combined values chart found in the *Guides.*

Based on this impairment, the deputy awarded Sherman 130 weeks of compensation for permanent partial disability payable at the stipulated rate of $285.70 per week. The deputy also granted Sherman's request for alternate medical care under Kienker for the thoracic outlet syndrome. However, he made no permanent partial disability award

for the thoracic outlet condition because no determination had yet been made whether the condition was permanent.

Pella appealed to the industrial commissioner, and Sherman cross-appealed. The commissioner (1) found Sherman failed to prove she suffered from thoracic outlet syndrome and (2) concluded that even if Sherman did, she failed to prove it was work-related.

The commissioner also found that Sherman suffered carpal tunnel syndrome and cubital tunnel syndrome, both of which were work-related. However, the commissioner refused to find that these conditions were such as to extend Sherman's impairment into a body as a whole disability. Rather, the commissioner determined these conditions were scheduled injuries.

As to these scheduled injuries, the commissioner considered the *Guides* as the "best evidence" of an appropriate impairment rating and accepted Neff's and Duffy's ratings because "they are consistent with the objective findings, restrictions and other evidence in this case." The commissioner concluded Sherman had proven a 3% disability of the right hand and had not proven any disability to the left hand or arm. Based on this disability the commissioner determined Sherman was entitled to 5.7 weeks (3% of 190 weeks) of permanent partial disability benefits for the right hand.

Sherman sought judicial review in the district court. The district court rejected Sherman's constitutional claims. The court also concluded that substantial evidence supported the commissioner's decision in all other respects.

On appeal to us, Sherman contends (1) the Iowa scheduled member system is unconstitutional, (2) she is entitled to industrial disability for unscheduled injuries, and (3) the commissioner erred in determining her benefits.

III. *Scope of Review.*

■ Under Iowa Code section 17A.19(8), our review of agency action is to determine whether our conclusions are the same as those of the district court. *Stephenson v.*

*Furnas Elec. Co.,* 522 N.W.2d 828, 831 (Iowa 1994). We may reverse, modify, affirm or remand to the agency for further proceedings if the agency's action is affected by errors of law or is not supported by substantial evidence, when the record is viewed as a whole. *Second Injury Fund v. Nelson,* 544 N.W.2d 258, 264 (Iowa 1996).

· ■ Evidence is "substantial if reasonable minds would accept it as adequate to reach the same finding. The question is not whether evidence might support a different finding, but whether the evidence supports the findings actually made." *Kiesecker v. Webster City Custom Meats,* 528 N.W.2d 109, 110 (Iowa 1995) (citations omitted).

IV. *Constitutionality of Scheduled Member System.*

Sherman contends Iowa Code section 85.34(2), Iowa's scheduled member injury provision, violates the Equal Protection Clause of the Fourteenth Amendment of the federal Constitution and the equal protection provision under the Iowa Constitution found in article 1, section 6. Specifically, she argues women suffer carpal tunnel syndrome, a scheduled injury, more frequently than men. Men, she asserts, suffer back injuries, a *nonscheduled* injury, more commonly than women. Thus, she concludes, women's injuries are more often scheduled and men's unscheduled. Because she believes scheduled member benefits are generally smaller than unscheduled benefits, Sherman asserts section 85.34(2) violates all women's equal protection rights as well as her own.

Pella responds in the following manner. First, it argues section 85.34(2) does not discriminate against women on its face. Second, at best, Sherman points out a disparate impact based solely on Neff's testimony that carpal tunnel syndrome is more prevalent in women than in men.

Sherman also contends the scheduled injury system *together* with the *Guides* violates equal protection.

The Equal Protection Clause of the Fourteenth Amendment of the federal Constitution provides that "[n]o state shall make or enforce any law which shall abridge the privi-

leges and immunities of citizens of the United States ... nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Article 1, section 6 of the Iowa Constitution—the counterpart to the federal Equal Protection Clause—provides that "[a]ll laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

We have recognized that article I, section 6 of the Iowa Constitution "puts substantially the same limitations on state legislation as does the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution." *Suckow v. NEOWA FS, Inc.*, 445 N.W.2d 776, 777 (Iowa 1989). We therefore apply the same analysis under the equal protection provisions of both constitutions. *Id.* at 778.

■ When a litigant raises an equal protection challenge, the level of scrutiny depends on the type of state statutory classification under attack. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465, 471 (1988). At the lowest level is the traditional rational basis analysis. *Id.* Under this analysis, a state statutory classification must be rationally related to a legitimate governmental purpose. *Id.*

■ A classification based on race or national origin and classifications affecting fundamental rights call for a most exacting scrutiny, an analysis commonly referred to as strict scrutiny. *Id.* Such a classification is "presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870, 883 (1979).

■ Between rational basis and strict scrutiny "lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex...." *Clark*, 486 U.S. at 461, 108 S.Ct. at 1914, 100 L.Ed.2d at 471. A party seeking to uphold a state statute based on gender must establish an "exceedingly persuasive justification" for the classification. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090, 1098 (1982). To meet this burden, the party seeking to uphold the challenged classification must show "that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* (citation omitted).

Sherman's equal protection challenge to section 85.34(2) is gender based. Accordingly, we limit our analysis to intermediate scrutiny.

■ A. *Equal protection challenge based on gender.* In a case involving a challenge similar to the one here, the United States Supreme Court rejected a denial-of-equal-protection challenge to a state law granting an absolute lifetime employment preference to veterans. *Personnel Adm'r*, 442 U.S. at 281, 99 S.Ct. at 2297, 60 L.Ed.2d at 889. In *Feeney*, the plaintiffs tried to show gender discrimination based upon a disparate impact argument. Rejecting the plaintiffs' argument, the Court provided a framework for assessing a gender-based equal protection attack against a facially neutral statute like the one here:

> When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a two-fold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. In this second inquiry, impact provides an "important starting point," but purposeful discrimination is "the condition that offends the Constitution."

*Id.* at 274, 99 S.Ct. at 2293, 60 L.Ed.2d at 884 (citations omitted).

In *Feeney*, there was clear evidence that the civil service job preferences to veterans adversely impacted more women than men. Despite the disparate impact, the Court held that the plaintiff failed to prove the statute "in any way reflects a purpose to discrimi-

nate on the basis of sex." *Id.* In reaching this decision, the Court reasoned as follows:

> The decision to grant a preference to veterans was of course "intentional." So, necessarily, did an adverse impact on nonveterans follow from that decision. And it cannot seriously be argued that the Legislature of Massachusetts could have been unaware that most veterans are men. It would thus be disingenuous to say the adverse consequences of this legislation for women were unintended, in the sense that they were not volitional or in the sense that they were not foreseeable.
>
> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group. Yet nothing in the record demonstrates that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service.

*Id.* at 278–79, 99 S.Ct. at 2296, 60 L.Ed.2d at 887–88 (citations omitted).

Like the Massachusetts veterans preference statute, Iowa Code section 85.34(2)—the scheduled member injury statute—is gender-neutral on its face. The statute talks in terms of "employees" and makes no distinction between male and female.

In *Feeney*, the Massachusetts legislature was aware that most veterans are men and could thus foresee the adverse consequences of a veterans preferential statute on women. Yet this fact was not enough to convince the Court that the statute had a "discriminatory purpose." The Court required more: The legislature must have passed the veterans preferential statute "because of," and not merely "in spite of," its adverse effect on women. *Id.* at 279, 99 S.Ct. at 2296, 60 L.Ed.2d at 887–89. Because there was no record evidence supporting this fact, the Court found the statute did not reflect a

purpose to discriminate on the basis of sex. *Id.*

Here, the only record evidence bearing on the question of "discriminatory purpose" is Neff's testimony that studies show carpal tunnel syndrome is more prevalent in women than in men because of physiological differences between the two sexes. There is no similar record evidence that a loss of a finger, hand, arm, leg, toe, eye or disfigurement of the face or head is more prevalent in women than in men. All of these, of course, are scheduled injuries under section 85.34(2). Thus, unlike the facts in *Feeney*, there is nothing to suggest that—except in one instance—the statute affects more women than men. The opposite was more likely when the legislature enacted the scheduled member injury statute almost ninety years ago because then there were more men than women in the work-force.

Given this state of the record, we do not even reach the question whether, when the legislature enacted or reenacted the scheduled member injury statute, it was aware the statute adversely affected more women than men. In these circumstances, we can hardly say the legislature enacted the scheduled member injury statute for the purpose of discriminating against women. Sherman has simply failed to show that the scheduled member injury statute "reflects a purpose to discriminate on the basis of sex." *Id.* at 281, 99 S.Ct. at 2297, 60 L.Ed.2d at 889.

■ B. *Scheduled injury system and the Guides as violative of equal protection.* Sherman offers a second constitutional attack: The scheduled injury system *together* with the use of the *Guides* violates equal protection. In support of her contention, Sherman relies heavily on *Texas Workers' Compensation Commission v. Garcia*, 862 S.W.2d 61 (Tex.Ct.App.1993).

The case dealt with the constitutionality of the 1989 Texas Workers' Compensation Act under the Texas Constitution. One of the provisions under attack provided supplemental income benefits to an eligible worker who was no longer eligible for impairment income benefits. To qualify for supplemental benefits the worker had to meet four criteria. One of those criteria required the worker to

have an impairment rating based on the *Guides* of 15 percent or more. *Garcia,* 862 S.W.2d at 77. The court held that the 15 percent threshold was not rationally related to the statute's purpose to increase compensation for injured workers and therefore violated the equal protection clause of the Texas Constitution. *Id.* at 89–90. Part of the reasoning for the holding was the mandatory use of the *Guides* to arrive at the 15 percent threshold. *Id.* at 89 n. 13.

The Texas Supreme Court later reversed this decision, holding that

> [i]t was not irrational for the Legislature to distinguish between moderately severe impairment likely to interfere with long-term employment from less severe impairment. Setting the threshold at 15 percent is a rational means of accomplishing this purpose.

*Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 524 (Tex.1995).

The court noted that the 1989 Act specifically required the use of the *Guides* to determine impairment. *Id.* at 526 n. 24. The court, however, concluded that this requirement did not rise to the level of a constitutional violation. *Id.* at 526.

In contrast to the Texas Workers' Compensation Act, the Iowa Workers' Compensation Act does not mandate that functional impairment for scheduled injury purposes be determined solely from the *Guides.* The only law dealing with this issue is found in an administrative rule that provides:

> **Guides to evaluation of permanent impairment.** The Guides to the Evaluation of Permanent Impairment. published by the American Medical Association are adopted as a guide for determining permanent partial disabilities under Iowa Code section 85.34(2) "a"-"s." The extent of loss or percentage of permanent impairment *may* be determined by use of this guide and payment of weekly compensation for permanent partial scheduled injuries made accordingly. Payment so made shall be recognized by the industrial commissioner as a prima facie showing of compliance by the employer or insurance carrier with the foregoing sections of the Iowa Workers' Compensation Act. *Nothing in this rule*

*shall be construed to prevent the presentations of other medical opinion or guides for the purpose of establishing that the degree of permanent impairment to which the claimant would be entitled would be more or less than the entitlement indicated in the AMA guide.*

> This rule is intended to implement Iowa Code section 85.34(2) and 1986 Iowa Acts, Senate File 2175, section 902.

Iowa Admin. Code r. 343–2.4 (emphasis added) (now codified at Iowa Admin. Code r. 873–2.4(85)). Under this rule, the *Guides* are just that—guides, and the commissioner is not bound to follow them. *Lauhoff Grain Co. v. McIntosh,* 395 N.W.2d 834, 839 (Iowa 1986).

We conclude Sherman has failed to show how the scheduled injury system together with the use of the *Guides* denied her equal protection.

### V. *Entitlement to Industrial Disability.*

Under this assignment of error, Sherman raises two issues. The first issue is whether substantial record evidence supports the commissioner's finding that Sherman failed to prove she has thoracic outlet syndrome. The second issue is whether substantial record evidence supports the commissioner's finding that Sherman failed to prove the combination of her conditions resulted in disability of the body as a whole. Sherman contends there is a lack of substantial record evidence to support either finding.

■ A. *The thoracic outlet syndrome issue.* Thoracic outlet syndrome is caused by compression of nerves and blood vessels, or both, at the base of the neck. 3 Robert K. Ausman & Dean E. Snyder, *Medical Library* § 4.8, at 45 (Lawyers ed.1989). Symptoms may occur anywhere from the shoulder to the fingers. *Id.* These symptoms include pain, numbness, swelling, loss of sensation and limb orientation (falling asleep), and weakness. *Id.*

As to the thoracic outlet syndrome, we note that Kienker recorded in her medical notes the following symptoms Sherman described to her:

She avoids [pulling] the skid full of parts, as pulling on it hurts her elbows, upper arms, shoulders and neck. She feels neck discomfort right away with pulling.... She said she feels worse now than she did prior to surgery. She is having searing elbow pain, particularly on the right, which she said she did not have prior to surgery. She has pain in the upper arms going into the shoulders and neck, which she did not have before.... She has a hot searing pain most of the time in the medial elbows.... She has discomfort going into her shoulders, across the upper deltoids and into the back of the right upper arm. She has occasional sharp shooting pains in the right forearm, front and back, mostly if she uses an air screwdriver.... Her right elbow is numb and feels tingly and prickly all the time....

Neff disagreed with Kienker's diagnosis that Sherman suffered from thoracic outlet syndrome because she based the diagnosis on Sherman's subjective complaints. To determine whether Sherman was suffering from thoracic outlet syndrome, Neff performed a noninvasive objective test known as Doppler screening. The test is used to verify the existence of intermittent claudication, a condition Kienker concluded supported her diagnosis of thoracic outlet syndrome. Neff described claudication as a diminished or reduced blood flow to part of the body. Neff noted that Sherman's Doppler screening studies were normal, ruling out intermittent claudication. He therefore concluded there was no objective support for a thoracic outlet syndrome diagnosis.

In addition, Neff believed repetitive work activity such as Sherman was doing cannot cause thoracic outlet syndrome. Although Neff agreed that Sherman did exhibit some symptoms that were consistent with thoracic outlet syndrome, he ruled out that diagnosis because there was no objective proof of an abnormality, only symptoms.

The commissioner gave greater weight to Neff's opinion because it was consistent with objective testing that showed the underlying condition of claudication was not present. In contrast, Kienker's opinion was based on merely subjective complaints. As the district

court correctly observed, the commissioner as the fact finder has the responsibility for determining credibility of the witnesses, and we are bound by the commissioner's findings if supported by substantial evidence. Ultimately, the question is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made. *Kiesecker*, 528 N.W.2d at 110. Although as fact finder, we might have found otherwise, we conclude there is substantial record evidence to support the commissioner's finding that Sherman failed to prove she suffered from thoracic outlet syndrome.

 B. *Combination of conditions resulting in disability of the body as a whole.* Sherman contends she suffered injury to scheduled members, her hands, and also to a part of her body not included in the schedule, her nervous system. For these reasons, she argues, she is entitled to compensation for industrial disability.

This court has held that when an employee has an injury to a scheduled member and also to a part of the body not included in the schedule, the resultant permanent disability is compensable as an unscheduled injury. *Barton v. Nevada Poultry Co.*, 253 Iowa 285, 291, 110 N.W.2d 660, 663 (1961). In *Barton*, the employee suffered an injury to the foot, a scheduled member. *Id.* at 287, 110 N.W.2d at 661. Because of the injury, causalgia affected the employee's entire nervous system. *Id.* This court held that because of the causalgia, the employee was entitled to compensation based on industrial disability. *Id.* at 292, 110 N.W.2d at 664.

 Our Workers' Compensation Act divides permanent partial disability into a scheduled or unscheduled loss. *See* Iowa Code § 85.34(2)(a)-(u). Section 85.34(2)(a)-(t) specifies the scheduled injuries, such as a loss of a hand, and sets forth the compensation payable for such injuries. Compensation for scheduled injuries is not related to earning capacity. *Honeywell v. Allen Drilling Co.*, 506 N.W.2d 434, 437 (Iowa 1993).

 In contrast, according to section 85.34(2)(u), unscheduled injuries are compensated by determining the employee's indus-

trial disability. One arrives at industrial disability by determining the loss to the employee's earning capacity. *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12, 14 (Iowa 1993). Measuring the employee's loss of earning capacity requires the commissioner to consider the employee's functional impairment, age, education, work experience, and adaptability to retraining, to the extent any of these factors affect the employee's prospects for relocation in the job market. *Klein v. Furnas Elec. Co.*, 384 N.W.2d 370, 374 (Iowa 1986).

When Sherman argues she has suffered injuries to her nervous system, an unscheduled member, we assume she is referring to the thoracic outlet syndrome, the myofascial neck pain, and the headaches. These, of course, are the injuries Kienker diagnosed.

We have already determined there is substantial record evidence to support the commissioner's finding that Sherman failed to prove she suffers from thoracic outlet syndrome. In addition, the commissioner found that even if Sherman suffered from such a condition, she failed to prove a causal connection between that condition and her work. The commissioner similarly found Sherman failed to prove the myofascial neck pain and headaches were causally related to her work. For reasons that follow, we conclude there is substantial record evidence to support all of these non-work related findings.

■ The employee must prove by a preponderance of the evidence that the injury is a proximate cause of the claimed disability. *Musselman v. Central*, 261 Iowa 352, 360, 154 N.W.2d 128, 132 (1967). A preponderance of the evidence exists when the causal connection is probable rather than merely possible. *Blacksmith v. All–American, Inc.*, 290 N.W.2d 348, 354 (Iowa 1980).

■ Generally, expert testimony is essential to establish causal connection. *Bodish v. Fischer, Inc.*, 257 Iowa 516, 521, 133 N.W.2d 867, 870 (1965). The commissioner must consider the expert testimony together with all other evidence introduced bearing on the causal connection between the injury and the disability. *Id.* The commissioner, as the fact finder, determines the weight to be given

to any expert testimony. *Id.* Such weight depends on the accuracy of the facts relied upon by the expert and other surrounding circumstances. *Id.; see Sondag v. Ferris Hardware*, 220 N.W.2d 903, 908 (Iowa 1974) (holding deputy commissioner disregarding uncontroverted expert testimony must state why). The commissioner may accept or reject the expert opinion in whole or in part. *Sondag*, 220 N.W.2d at 907.

As mentioned, Kienker diagnosed Sherman with three conditions: thoracic outlet syndrome, myofascial neck pain, and headaches. The commissioner found that Kienker based her opinions on subjective complaints from Sherman and not on objective tests. In addition, the commissioner found that Kienker attributed the problems to both work and nonwork conditions and that it was unclear whether Kienker had an accurate history of Sherman's 13 year history of headaches.

Sherman's work involved repetitive activity. According to Neff, repetitive activity cannot cause thoracic outlet syndrome and myofascial pain. Although he agreed that Sherman exhibited symptoms consistent with these two conditions, Neff opined Sherman had neither condition because there was no objective proof of an abnormality, only symptoms. Neff also refused to connect Sherman's headaches to her work activity, noting that she had a 13 year history of headaches.

For all of these reasons, the commissioner found that Kienker's opinion did not "rise to the level of a probable connection between Sherman's work and her alleged condition." Again, although as fact finder we might have found otherwise, we conclude substantial record evidence supports the commissioner's finding and we are bound by it.

The commissioner explained why he accepted Neff's opinion that Sherman's conditions were not work-related rather than Kienker's opinion that they were:

Dr. Neff's opinion is more consistent with the contemporaneous medical notes and reports as regards Sherman's symptomatology and treatment during her employment. They, therefore, are entitled to greater weight than the opinions of Dr.

Kienker, whose opinions are inconsistent with objective medical notes and reports. Substantial record evidence also supports these findings.

Given all of these findings, the commissioner concluded the record

does not support a finding that [Sherman's] conditions other than her carpal tunnel and cubital tunnel are conditions causally related to her employment at Pella. Neither the cubital tunnel nor the carpal tunnel condition are conditions which would extend [Sherman's] impairment related to her employment at Pella into the body as a whole. [Sherman's] condition causally related to her employment with Pella is expressly found and concluded to be a scheduled member impairment.

In short, because Sherman failed to prove the thoracic outlet syndrome, the myofascial neck pain, and headaches were work-related, she failed to prove the scheduled injuries affected her nervous system, an unscheduled member. She was therefore not entitled to a claim based upon a disability to the body as a whole.

VI. *Error in Denial of Further Benefits.*

Under her last assigned error, Sherman raises a potpourri of contentions, only one of which we address. The others either lack merit or we have disposed of them in our discussion in division V.

The contention we do address concerns Sherman's claim that substantial record evidence does not support the commissioner's finding as to the extent of her disability. We conclude otherwise.

As mentioned, the commissioner concluded that the only injuries causally related to her work were the carpal tunnel and cubital tunnel conditions, both of which were scheduled member impairments. The commissioner determined that Sherman had established a disability of three percent of the right hand. He also determined she had not established a disability to the left hand or arm.

In effect, the commissioner accepted the ratings of Duffy, the physical therapist. Duffy arrived at this determination utilizing

the *Guides.* Neff concurred in the disability rating.

Section 85.34(2) provides for permanent partial disability compensation for the loss of a scheduled member. The law limits disability resulting from a scheduled injury to the physiological or functional loss of the body part. *Simbro v. Delong's Sportswear,* 332 N.W.2d 886, 887 (Iowa 1983). The commissioner arrives at functional disability by determining the impairment of the employee's bodily function and limits the functional disability to the loss of the physiological capacity of the injured body or body part. *Second Injury Fund v. Bergeson,* 526 N.W.2d 543, 547 (Iowa 1995).

The commissioner may use either medical or nonmedical evidence to determine the extent of disability of a scheduled member. *Miller v. Lauridsen Foods, Inc.,* 525 N.W.2d 417, 421 (Iowa 1994). Thus, lay testimony could buttress the medical testimony and would be relevant and material in determining the cause and extent of the employee's injuries. *Id.*

As mentioned, when relying on medical evidence, the commissioner may use the *Guides* for determining the disability of a scheduled member. Iowa Admin. Code r. 343–2.4 (stating that "[t]he extent of loss or percentage of permanent impairment may be determined by use of this guide and payment of weekly compensation for permanent partial scheduled injuries made accordingly"). If the employer or the insurance carrier makes payment based on the functional disability so determined, the rule directs the commissioner to recognize the payment as prima facie showing of compliance with the Iowa Workers' Compensation Act. *Id.* On the other hand, the rule does not prevent the presentation of other medical opinion or guides to establish that the degree of permanent impairment would be more or less than the *Guides* indicate. *Id.*

Thus, the commissioner was on solid ground in considering the *Guides* when assessing the medical evidence before him. *See Lauhoff,* 395 N.W.2d at 839 (holding that commissioner may consider the *Guides).* The commissioner gave no weight to Kienk-

er's ratings of impairment because he found Kienker's ratings were inconsistent with the objective evidence and appeared to be based in part on conditions unrelated to Sherman's work. Most significantly, the commissioner found that Sherman had not established she even had thoracic outlet syndrome. Or, even if Sherman had such a condition, she failed to prove it was work-related. Earlier, we concluded there was substantial record evidence to support these findings. We also concluded there was substantial record evidence to support the commissioner's finding that the other two conditions—myofascial neck pain and headaches—were not work-related.

On the other hand, the commissioner concluded Duffy and Neff arrived at their ratings utilizing the *Guides*. The commissioner found these ratings were consistent with the objective findings, restrictions and other evidence in the case. Part of this included Dr. Charles F. Denhart's diagnosis.

On July 8, 1993, Denhart gave his opinion that Sherman's right and left ulnar and left median nerve conduction studies were normal. He indicated the studies showed that only the right median orthodromic sensory latency was prolonged. He interpreted these findings as "consistent with a mild residual right carpal tunnel syndrome."

Denhart performed the same objective testing on March 31, 1994 and concluded:

> The right orthodromic sensory latency is prolonged consistent with a mild residual right carpal tunnel syndrome. This has improved, however, since the last exam in July 1993.

> Finding: The right ulnar and left median and ulnar nerve conduction studies are normal.

> The EMG needle is normal. No evidence for a cervical radiculopathy.

Although Sherman and her husband testified that her injuries rendered her incapable of performing basic household chores and caused her pain, there is substantial record evidence supporting the commissioner's conclusion she suffered only scheduled injuries and no disability to the body as a whole. Based on the record before us, we cannot say the scheduled injury ratings the commission-

er came to lacked substantial record evidence.

## VII. *Disposition.*

Sherman has failed to prove Iowa's scheduled injury system violates the equal protection provisions found in the Fourteenth Amendment of the federal Constitution and the equal protection provision of the Iowa Constitution. Contrary to her claims, the scheduled injury system does not unconstitutionally discriminate against women. In addition, Sherman has failed to prove that the use of the *Guides* together with the scheduled injury system denies her equal protection.

Substantial record evidence supports the commissioner's finding that Sherman failed to prove she suffers from thoracic outlet syndrome. Substantial record evidence also supports the commissioner's finding that even if Sherman suffers from such a condition she has failed to prove it was work-related.

In addition, substantial record evidence supports the commissioner's finding that Sherman has only a scheduled injury rather than a disability to the body as a whole. Substantial record evidence likewise supports the commissioner's finding regarding Sherman's scheduled injury impairment.

For all of these reasons, we affirm the district court's order affirming the commissioner's decision.

**AFFIRMED.**