# IN THE COURT OF APPEALS OF IOWA

No. 21-0523
Filed January 12, 2022

**MERCY MEDICAL CENTER and INDEMNITY INSURANCE COMPANY OF NORTH AMERICA,**
    Plaintiffs-Appellees,

**vs.**

**NORMA LUND,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.


    Norma Lund appeals the district court's ruling on judicial review reversing the workers' compensation commissioner's causation finding. **REVERSED.**


    Robert E. McKinney, Waukee, for appellant.

    Charles E. Cutler and Gregory M. Taylor of Cutler Law Firm, P.C., West Des Moines, for appellees.


    Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

Norma Lund appeals the district court's judicial review decision reversing the workers' compensation commissioner's finding that her bilateral shoulder injuries were caused by her employment with Mercy Medical Center. She claims the district court misapplied the law and erroneously concluded there was a lack of evidence to support a determination of medical causation. We reverse the decision of the district court.

**I. Background Facts and Proceedings.**

Lund began working for Mercy Medical Center in December 2016 as a sterilization processing technician.[1] The job involved assembling the materials needed for surgeries, placing the materials on large trays, placing the trays on carts for sterilization, pushing the carts in and out of the sterilizer, and putting the materials away. The job description provided by Mercy states the sterilization processing technician position requires heavy work exerting up to sixty-five pounds of push/pull (force to move frequently), lifting up to fifty pounds sometimes, lifting up to forty pounds frequently, lifting up to twenty pounds constantly. Lund is five foot three inches tall; the top shelf of the cart Lund placed trays on was above her shoulder level. The trays had varying weights but were not supposed to exceed twenty-five pounds. Vendor trays generally weighed more than in-house trays. During the week, eight people were assigned to sterilization processing duties. On weekends, two people were assigned.

---

[1] We will refer to Mercy Medical Center and its insurer, Indemnity Insurance Company of North America, collectively as "Mercy."

On Saturday, February 24, 2018, Lund worked her 3:00 p.m. to 11:30 p.m. shift with no difficulties or complaints. Her coworker that day had recently had dialysis, and Lund felt he was not helpful because of his physical limitations. On Sunday, February 25, Lund worked the same shift with the same coworker. Around 6:30 p.m., while lifting a vendor tray above her shoulder height, Lund felt pain in the right side of her neck, radiating down into her chest. Both shoulders felt tight and sore, but Lund continued to perform her duties through the rest of her shift. Lund had Monday off. She returned to work on Tuesday with ongoing neck and shoulder pain; a coworker helped with the heavy trays.

Lund continued to work and did not report her injury because she hoped it would resolve itself. It did not.

On March 15, 2018, Lund sought medical care with Dr. Todd J. Harbach. In a later letter to Mercy's counsel, Dr. Harbach noted:

> She was doing a lot of lifting to sterilize instruments for surgery, and when I saw her, she was complaining of 50% cervical and 50% bilateral arm pain. I specifically asked her if there was any trauma or inciting incident at the time of my meeting with her, and she could not specifically remember anything but rather just hurt after performing all of the activities required of her job for several shifts.

Dr. Harbach diagnosed Lund with bilateral shoulder impingement and gave her subacromial injections in both shoulders. He recommended physical therapy, prescribed medications, and imposed work restrictions.

On March 16, Lund reported the injury to her supervisor. Lund was seen that same date at Mercy Employee Health. The notes from that appointment state, "Employee believes this is related to work activities."

Lund was referred to Mercy One for evaluation. On March 19, Lund was examined by Advanced Registered Nurse Practitioner (ARNP) Joanne Harbert. ARNP Harbert noted, "States hurt herself lifting surgical pans.[2] She thought she hurt her neck and went to see ortho and was injected both shoulders and told she tore both rotator cuffs." Harbert diagnosed Lund with acute bilateral shoulder strain. Lund was placed on restrictions and ordered to go to physical therapy. Neither the restrictions nor the physical therapy improved Lund's condition.

An MRI performed on May 14, showed a full-thickness tear of the right rotator cuff.[3] Lund was referred by Mercy to an orthopedist.

Dr. Steven A. Aviles saw Lund on June 11 for right shoulder pain. Lund stated she was working as a sterile processor and "hurt herself lifting surgical pans." His office notes state:

> Onset: on 02/25/2018. Severity level is 3. It occurs constantly and is stable. Location: right shoulder. The pain is aching. Context: there is an injury. Trauma type: lifting, occurred at work. Hand Dominance: right.
> [Lund] is a 57-year-old woman who developed RIGHT shoulder pain after working a weekend for sterile processing. She states that she does not remember any clear injury, but that she had significant pain the evening of Sunday after working the Saturday and Sunday shift. She incidentally does complain of LEFT shoulder pain.

Dr. Aviles diagnosed Lund with a right full-thickness rotator cuff tear. He recommended surgery.

Lund continued to work with light-duty restrictions until June 18, when she was removed from her job.

---

[2] The terms surgical pan and tray are interchangeable.
[3] Despite Lund's complaint of pain in both shoulders, initially her treatment focused on her right shoulder.

On July 9, Dr. Aviles responded to correspondence from Mercy's counsel and observed Lund could not recall a particular trauma or injury but described pain as a result of increased workload. He did not believe the rotator cuff tears resulted from work but an occurrence that is a "fairly normal phenomenon." Mercy provided no further treatment for Lund's shoulder injuries.

On October 17, Lund petitioned for workers' compensation benefits, alleging she had suffered a body-as-a-whole injury as a result of "lifting at work."

Lund sought treatment from Dr. Jeffrey P. Davick, who performed surgery on her right rotator cuff on November 29. Dr. Davick's notes state Lund "is a 57-year-old female who injured the right shoulder at work. She was working at Mercy Hospital in sterile processing. She was repetitively putting trays on a shelf above shoulder height and felt a deep pull in her right shoulder."

On March 18, 2019, ARNP Harbert responded to an inquiry from Mercy's counsel in which she described Lund's intake sheet history of the injury as related to "lifting heavy objects over shoulders on a cart." ARNP Harbert replied she "agree[d] with the Dr. Aviles medical opinion" described by counsel as "Ms. Lund's shoulder abnormalities were not caused by her work at Mercy Medical Center on or about February 25, 2018."

On March 19, an MRI of Lund's left shoulder revealed a full-thickness tear of the left rotator cuff. Dr. Davick performed surgery to repair the left rotator cuff on April 2.

On April 26, Lund's counsel summarized a meeting with Dr. Davick, which Dr. Davick confirmed:

During our meeting, you did express the following opinions, all to a reasonable degree of medical certainty;

1. You provided medical treatment for Ms. Lund relative to injuries to her right and left supraspinatus (rotator cuff tears).

2. Your diagnosis is traumatic full thickness rotator cuff tears at the insertion of the supraspinatus, both left and right.

3. That the nature of the work performed by Ms. Lund at Mercy Medical Center, and specifically on the date of her injury, as described in the enclosed narrative, as well as the description presented to you by her during, your treatment, is consistent with the type of activity resulting in rotator cuff/supraspinatus tears, and therefore is considered a substantial and material causative factor in both the right and left tears, and therefore more probable than not, the cause of both the right and left rotator cuff tears.

On April 29, Dr. Aviles responded to a letter from Mercy's counsel in which he stated Lund "did not describe any specific trauma when she came to see me on June 11, 2018." He also noted:

[U]pon my review of [a May 14, 2018] MRI . . . there was adipose architecture in the volume that was lost as a result of the supraspinatus tear. This only develops as a result of chronic injury. Furthermore, there was no evidence of acute trauma in the joint including no blood in the joint or edema in the bone. I saw no evidence of acute injury present. All evidence suggested that this was a more chronic tear.

Dr. Aviles "reaffirm[ed] that the type of work activities as described by Norma Lund are not considered a cause for the rotator cuff tear that I had seen on the MRI."

On September 9, Dr. Aviles wrote a letter agreeing that if Lund had lifted fifty pounds overhead repeatedly and at one point felt a pop with new onset of pain that it could be the cause of the rotator cuff tear as seen on her MRI dated May 14, 2019.

Lund had not been released from Dr. Davick's care at the time of the hearing for workers' compensation benefits held on October 31. At the hearing, Dr. Aviles's October 21 deposition was admitted. He agreed lifting could cause a rotator cuff

tear; however, he opined, "But the vast majority of people who have manual labor lifting never have a rotator cuff tear. So lifting can, but not under chronic repetitive stress for the most part. It's usually an acute trauma." Because Lund did not report an acute trauma to him, he did not believe her injury was work-related.

Several witnesses testified about the weight of the trays and the number of trays Lund lifted during her February 25 shift. Lund testified she lifted "at least" ten vendor trays, which were heavier than others, and she estimated the trays were in the thirty- to forty-pound range. It was when she lifted the vendor trays above shoulder height that she felt the pain in her neck. Lund also testified she lifted about 100 trays from the washer: "That's what it felt like, at least a hundred."

Cindy Jennings was the sterile processing supervisor and Lund's direct supervisor that day. She could not state what Lund's workload was on February 25 but felt Lund overstated her workload. Jennings testified, "We do not have trays that weigh up to forty pounds." When asked how she knew, "Because we have a scale. Joint Commission requires our trays to be twenty-five pounds." She then testified there are "some trays that weigh up to twenty-seven, twenty-eight pounds, but we do not have forty-, fifty-pound trays." On cross-examination, Jennings agreed Lund "would be lifting trays classified as heavy over her head."

Lund's coworker testified the "vast majority" of the trays they lifted were in the twenty-to-twenty-five pound range, some were thirty pounds, and he had "never even lifted more than forty on that job." He thought they had a "normal" workload that weekend. Deposition testimony from other Mercy employees was also admitted.

The deputy commissioner issued an arbitration ruling, finding:

the pans weighed no more than [twenty-five] to [twenty-seven] pounds; that some trays were lifted at or above shoulder height and that while most of the trays lifted at or above shoulder height should have been light, [Lund] could have lifted vendor trays and placed them in the uppermost part of the sterile carts, and that she could have handled 100 trays during one shift.

The deputy also found:

Dr. Davick also agreed, based on [Lund's] narrative of how the incident occurred, that it was more probable than not her work was the cause of both the right and left rotator cuff tears. [Lund's] narrative called the vendor trays heavy but did not define heavy by weight. She stated that she was working three times as hard as a typical workday and that she would be lifting these heavy vendor pans on the tops of carts.

The deputy concluded Lund's bilateral shoulder injuries resulted from her work and manifested on or about February 25, 2018.[4]

On intra-agency appeal, Mercy argued Lund's bilateral shoulder condition was not work-related either as an acute injury or as a cumulative injury. The commissioner, however, agreed with the deputy's findings with this additional analysis:

It is undisputed that [Lund] began experiencing symptoms during and after her shift on February 25, 2018. Both at hearing and in her deposition, [Lund] testified she "felt something"—like a "pop" or a "pull"—in what she believed to be her neck as she was lifting a tray above shoulder height during a busy shift. There is some dispute as to whether [Lund] told several of her physicians about this "pop" or "pull" sensation, but both Steven Aviles, M.D., and Jeffrey Davick, M.D.—the competing experts in this case—were aware [Lund's] symptoms began while performing her work duties, which included lifting pans.
    Dr. Aviles, [Mercy's] expert, initially opined there was "nothing in the work that [Lund] described that would result in rotator cuff tearing to her right shoulder." He later explained that [Lund] "had described activities consistent with normal activities of daily living."

---

[4] The deputy found Lund had a preexisting shoulder condition that was "lit up or aggravated on February 25, 2018, from lifting pans weighing up to [twenty-five] pounds, some at or above shoulder height."

However, as correctly noted by the deputy commissioner, there is nothing in [Lund's] regular day-to-day life that matches the work she performed during her shifts with [Mercy], which included several hours of lifting approximately 100 trays between [twenty-five] and [twenty-seven] pounds on a repetitive basis—and, per her job description, some occasional heavier lifting. In fact, when presented with [Lund's] deposition testimony about lifting trays weighing [fifty] pounds on a repetitive basis, Dr. Aviles acknowledged that "it is possible under these circumstances that lifting a [fifty]-pound pan overhead could cause rotator cuff tearing."

As discussed above, I affirmed the deputy commissioner's finding that [Lund's] repetitive lifting involved pans that weighed roughly [twenty-five] pounds—not [fifty] pounds. As such, I recognize Dr. Aviles' acknowledgment is not based on circumstances that perfectly reflect [Lund's] actual duties. This acknowledgement, therefore, is only afforded nominal weight. However, it remains a consideration, particularly because Dr. Aviles failed to explain why [Lund] became symptomatic while performing her work activities if these duties did not contribute to, or cause, her condition.

In contrast to Dr. Aviles' opinion, Dr. Davick opined that the "nature of the work performed" by [Lund] . . . were "consistent with the type of activity resulting in rotator cuff/supraspinatus tears." Dr. Davick then agreed that [Lund's] work activity would be considered "a substantial and material causative factor" in [her] bilateral rotator cuff tears. I acknowledge Dr. Davick's opinion—like Dr. Aviles' opinion—is not without its flaws. As correctly noted by the deputy commissioner, the narrative contained in [Lund's] Exhibit 2 on which Dr. Davick relied, at least in part, varied slightly from the deputy commissioner's findings of fact. Ultimately, however, Dr. Davick's opinion is most consistent with the onset of [Lund's] symptoms and the fact that [Lund] was asymptomatic before her shift on February 25, 2018.

The commissioner concluded:

Though both expert's opinions are flawed in some respect, I found Dr. Davick's opinion to be most consistent with [Lund's] consistent testimony and her work duties. Thus, considering the work [Lund] was performing on February 25, 2018, along with [her] lay testimony regarding the onset of her symptoms and Dr. Davick's expert testimony regarding causation, I find claimant satisfied her burden to prove she sustained an injury to her bilateral shoulders on February 25, 2018, that arose out of and in the course of her employment.

Having found claimant sustained an acute or traumatic injury on February 25, 2018, [Mercy's] argument regarding their due process rights is now moot.

Mercy sought judicial review in the district court, which reversed the commissioner's causation finding. Lund appeals.

## II. Scope and Standard of Review.

A final judgment rendered by a district court under chapter 17A is reviewed for errors of law. Iowa Code § 17A.20 (2020); Iowa R. App. P. 6.907. On judicial review of an agency action, the district court may only interfere with the commissioner's decision if it is erroneous under one of the grounds enumerated in section 17A.19(10). On appeal from the district court's decision, we apply the same standards to determine whether we reach the same conclusions as the district court. *Niday v. Roehl Transp., Inc.*, 934 N.W.2d 29, 34 (Iowa Ct. App. 2019). If we do, we affirm the district court's decision; otherwise, we reverse. *Id.*

"Our decision is controlled in large part by the deference we afford to decisions of administrative agencies. Medical causation presents a question of fact that is vested in the discretion of the workers' compensation commission." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011).

## III. Discussion.

In *Pease*, our supreme court noted:

Medical causation "is essentially within the domain of expert testimony." The commissioner, as trier of fact, has a duty to weigh the evidence and measure the credibility of witnesses. The weight given to expert testimony depends on the "accuracy of the facts relied upon by the expert and other surrounding circumstances." Also, an expert's opinion is not necessarily binding upon the commissioner if the opinion is based on an incomplete history. Ultimately, however, the determination of whether to accept or reject

an expert opinion is within the "peculiar province" of the commissioner.

*Id.* at 845 (citations omitted).

The district court determined Dr. Davick "provided an inadequate threshold for medical causation when he concluded that the consistency between [Lund's] work activities and a rotator cuff tear was the equivalent ('therefore') of those activities being a substantial, material and probable cause of both tears." The court found Dr. Davick's opinion flawed because he "equated consistency with probability" and he was "provided no other factual basis upon which to conclude that [Lund's] work activities were the cause of her injuries." From the decision, it appears the district court read Dr. Davick's opinion to mean the relationship between the work activity and the bilateral rotator cuff tears was only a possibility. Instead, the commissioner found Dr. Davick explained the causal connection between the nature of the work—lifting heavy trays above shoulder height—with the resulting rotator cuff tears and that it was "more probable than not, the cause of both the right and left rotator cuff tears." *See Doe v. Central Iowa Health System*, 766 N.W.2d 787, 793 (Iowa 2009) (requiring evidence of the theory of causation to be "reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence.").

**"**The rule is that expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation." *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004). The nature of medical causation will depend on probability and is often answered through the opinions of experts. *Pease*, 807 N.W.2d at 845. The substantial-evidence standard directs

the court "to determine whether substantial evidence, viewing the record as a whole, supports the finding *actually made.*" *Id.* (emphasis added). "Evidence is not insubstantial merely because different conclusions may be drawn from the evidence." *Id.*

We are charged by statute and precedent to acknowledge "the commissioner, as fact finder, is responsible for determining the weight to be given expert testimony." *Id.* at 850. And "[t]he commissioner is free to accept or reject an expert's opinion in whole or in part, particularly when relying on a conflicting expert opinion." *Id.* The commissioner considers the expert opinion "*together with all other evidence introduced bearing on the causal connection between the injury and the disability.*" *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998) (emphasis added). If an expert opinion alone cannot support a finding of causation, the opinion can be coupled with other nonexpert testimony to support a factual finding of causation. *Nicks v. Davenport Produce Co.*, 115 N.W.2d 812, 815 (Iowa 1962). This is precisely what the commissioner did here. The commissioner considered the competing expert opinions, recognized the weaknesses in each, and ultimately found Dr. Davick's opinion to be most consistent with Lund's "consistent testimony and her work duties."

We have set out the evidence in some detail above. We find substantial evidence supports the workers' compensation commissioner's decision, and the district court erred in reversing the commissioner's award. The judgment entered by the district court is reversed and the commissioner's decision is reinstated.

**REVERSED.**