**Pam CLARK, Appellant,**

v.

**VICORP RESTAURANTS, INC., Employer and Kemper Insurance Company, Insurance Carrier, Appellees.**

No. 03–1870.

Supreme Court of Iowa.

May 20, 2005.

Thomas M. Werner, Des Moines, for appellant.

Harry W. Dahl, Des Moines, for appellees.

LAVORATO, Chief Justice.

In an arbitration proceeding, a hearing deputy found that the claimant, Pam Clark, had suffered a temporary total disability as a result of a work-related injury rather than a permanent partial disability as Clark had contended. On Clark's intra-agency appeal, the deputy commissioner affirmed and adopted as final agency action the hearing deputy's decision on this issue. Clark petitioned the district court for judicial review and that court affirmed. Clark appealed, we transferred the case to the court of appeals, and that court reversed and remanded the case for further proceedings. We granted the application for further review filed by the employer and its carrier. On that review, we vacate the court of appeals decision and affirm the district court judgment.

## I. Background Facts.

Clark is forty-one years old, married, and has two teenage children. She is a high school graduate and has no further education or training. Since graduating from high school, she has worked in food service, at a dog kennel, for a fishing lure business, in housekeeping at a hospital and a hotel, and as a telemarketer.

Vicorp Restaurants, Inc. hired Clark in November 1989 to work as a part-time cashier/hostess at its Bakers Square restaurant in Des Moines. A few months later she also began working as a waitress at that establishment.

Clark has suffered several work-related injuries while working at Bakers Square. In July 1991 Clark suffered a neck injury while carrying a bus tub. As a result of that injury, Dr. Rodney Johnson performed a surgical anterior interbody fusion at C6–7 in April 1992. Clark was released to work in August 1992 with a twenty-five pound lifting and carrying restriction. Because of this restriction, her supervisors at Bakers Square decided Clark could work only as a cashier/hostess.

In December 1997 Clark was again injured at work. This time a pie transit flipped onto her right shoulder, injuring her neck and shoulder. As a result of those injuries, Dr. Lynn Nelson performed a cervical fusion at C5–6, and Dr. Delwin E. Quenzer performed two surgeries on Clark's shoulder, one in April 1999 and another in November 1999. Clark returned to work at Bakers Square but under doctor's orders was to do no lifting. She answered the phone and took pie orders, working just a few hours per day. In March 2000 Clark was able to resume her full duties as a cashier/hostess, but was told by her doctors to abide by the same twenty-five pound lifting restriction she had been under since her release by Dr. Johnson in August 1992.

On July 7, 2000, Clark sustained an injury at work that is the subject of this appeal. On that day, she was working as a host supervisor. Both restaurant managers were off-duty, and Clark was supervising. Because the restaurant was short-handed that day, Clark acted as a waitress, cashier, host, and supervisor. While twisting to hand plates to a customer who was sitting on the inside of a booth, Clark felt a pop in her neck. Several minutes later while moving a tub of dishes, glasses, and silverware from a table, Clark twisted and felt a pop in the lower part of her back. She continued working, and a short time later, she started to experience a headache and stiffness and soreness in her neck and back. Despite this discomfort, Clark did complete her shift.

The next day, with the permission of her supervisor, Clark sought treatment at the Iowa Lutheran Hospital emergency department. She complained of neck and back pain and numbness in her arms and legs. The assessment in the emergency department report was "musculoskeletal sprain of the cervical and lumbar spine." X-rays were taken and Clark was given several medications. She was also told to see her family doctor. In addition, she was given a work excuse to return to work on July 12, 2000, with no lifting for two weeks of anything weighing more than ten pounds.

Clark did not return to work on July 12 because a Vicorp risk management representative told her to stay off work until she saw either Dr. Nelson, who had performed her last neck surgery, or Dr. Quenzer, who had performed her two shoulder surgeries. On July 18 Clark saw Dr. Nelson. At the time she still had back pain. Dr. Nelson's impression was "myofascial global back pain." He saw no indication for surgical treatment and recommended evaluation

and management of myofascial complaints by a physiatrist as well as physical therapy. Dr. Nelson did not release Clark to return to work. In his deposition taken in April 2002, Dr. Nelson could not state within a reasonable degree of medical certainty that Clark's complaints were a result of the July 7, 2000 incident.

On July 27 Clark saw Dr. Quenzer. At the time, Clark was complaining of numbness in both arms and legs. Dr. Quenzer's impression was "dysesthesias of undetermined etiology." He recommended that Clark see a neurologist to rule out a neurological problem and a physiatrist, if there was no neurological problem, to coordinate her work status and maintenance medical care.

On August 17 in a letter to Kemper Insurance Company, Vicorp's carrier, Dr. Quenzer opined that he was

not aware of any anatomically based diagnosis which would explain [Clark's] current symptom complex. My opinion is that it is not possible to state with a reasonable degree of medical certainty that [my diagnosis of dysesthesias of undetermined etiology] is a result of employment at Vicorp Restaurants.

Dr. Quenzer also stated he had not restricted employment "as a result of the alleged injury of July 7, 2000." Shortly after this letter, the carrier denied Clark's claim for benefits. Following the denial, Clark sought permission from her employer's carrier to go back to work. She was told she would have to get a release from her family doctor to do so. In the meantime, with her employer's permission, Clark went on a medical leave of absence without pay.

Following the carrier's suggestion, Clark saw Dr. Dennis Hopkins, her family doctor, who referred her to Dr. Michael R.K. Jacoby, a neurologist. Dr. Jacoby examined Clark on September 8 and October 11. In his report of November 3 to Dr. Hopkins, Dr. Jacoby ruled out any neurologic cause for her condition. In addition, Dr. Jacoby recommended that Clark see an orthopedic physician.

Acting on Dr. Jacoby's suggestion, Clark saw Dr. Leslie Hillman, a physiatrist with the Iowa Orthopaedic Center, P.C. on November 14. On that date, Dr. Hillman examined Clark and opined that Clark was suffering from "myofascial neck and back pain" and "headaches." Dr. Hillman ordered conservative treatment, including physical therapy.

Following a functional capacity assessment of Clark, Dr. Hillman prescribed work restrictions on December 22. They included a ten-pound lifting restriction with each individual extremity, floor-to-chair lifting of twenty pounds bilaterally with the upper extremities, five-pound individual extremity above shoulder lifting, with avoidance of repetitive kneeling, climbing, and balancing. Dr. Hillman also limited Clark to no more than sixty minutes of repetitive use of Clark's upper extremities. In addition, the doctor specified that Clark should sit no longer than thirty minutes at a time and stand no more than thirty minutes at a time, with breaks.

Meanwhile, on December 11 Vicorp's leave-of-absence coordinator notified Clark by letter that her leave of absence would expire on January 3, 2001 and advising her of the following:

By policy, the maximum amount of time on leave from the company is 180 days. If you are unable to return to work by the above date I will process your termination effective 1/04/01. When you are able to return to work, please contact your General Manager concerning possible re-hire.

Clark enjoyed her job at Bakers Square, wanted to return to work, and believed she

could perform her job with these restrictions. She took a copy of Dr. Hillman's restrictions to a Bakers Square manager on December 26. On the same day, Clark called Vicorp's leave-of-absence coordinator and informed the coordinator of the restrictions. Several days later, the coordinator advised Clark by phone that Vicorp had decided against letting Clark return to work.

On January 3, 2001, the Vicorp leave-of-absence coordinator wrote Clark terminating her employment effective January 4, 2001. The letter stated:

> Our records reflect that your Leave of Absence has expired as of 1/3/01.

> By policy, the maximum amount of your leave from the company is 180 days. Therefore, effective 1/4/01, I processed your termination of employment. When you are able to return to work please contact your General Manager.

Thereafter, Clark's attorney wrote Vicorp several letters requesting her reinstatement. Vicorp responded on January 18 with a job description for a host/hostess and noted "there are significant lifting requirements from which your client has been significantly restricted." Vicorp also noted that Clark's doctor "has identified her restrictions to be temporary in nature." Vicorp concluded:

> When your client obtains maximum medical improvement and her medical condition has stabilized for a permanent rating, please let us know. If she is able to meet the essential functions of this job with some type of reasonable accommodation, we will reconsider her for employment. Merely asserting that she need not perform minor bussing responsibilities misses the mark. Bussing is one of the essential functions of her job and, if she is unable to meet the physical requirements necessary, she can propose a reasonable accommodation which we can review.

The job description for the host/hostess includes a list of responsibilities, one of which is supporting servers and bussers as requested. Essential physical requirements include "[l]ifting and carrying 25# and 60# maximum, pushing, pulling 250# maximum."

Following the termination of her employment, Clark continued treating with Dr. Hillman. Dr. Hillman referred to the work restrictions in her medical notes on several occasions. On December 6, 2000, Dr. Hillman wrote:

> My recommendation at this point would be for her to have a physical capacity exam through physical therapy to determine exactly what her restrictions are on lifting, sitting, standing, etc., and then fill out a work restriction and see if she can go back to work in some sort of limited capacity while she continues to improve with therapy. . . . She is very concerned that she will not be able to perform the duties necessary to do that position in the future.

On December 22, 2000, Dr. Hillman wrote in her notes that she had received results of Clark's functional capacity exam and based on those results would release Clark to modified work with the restrictions previously listed. Dr. Hillman also noted that she would like Clark "to work 4 hours daily for three weeks and then increase by 2 hours daily per week."

On February 14, 2001, Dr. Hillman wrote in her notes that she "again would not be willing to release [Clark] to any type of full duty until she could get into a work hardening program and will need to release her as the results of her functional capacity exam." And one month later, she wrote,

I again would be willing to release her to any type of full duty based on the results of her functional capacity exam with those limitations. If it is possible to get her more physical therapy ... we could have her do some work hardening and try to decrease those restrictions.

On January 16, 2002, responding to a letter from the carrier's and employer's attorney, Dr. Hillman wrote:

I feel the condition that Ms. Clark presented with was most likely an exacerbation caused by the incident on July 7, 2000, and I feel that this would have most likely caused problems that are temporary in nature.

After describing the restrictions given in December 2000 as a result of Clark's functional capacity exam, Dr. Hillman stated in the letter that the functional capacity exam was over a year ago, and "if there are questions about permanent work restrictions, the possibility of repeating the functional capacity exam to determine safe techniques at this time could be entertained."

Clark sought another opinion concerning her condition. She requested an evaluation from Dr. Justin L. Ban, who is now deceased. He evaluated her on January 9, 2002. His opinion was that (1) Clark's condition was related to the work incident on July 7, 2000, (2) she reached maximum medical improvement with respect to her sacroiliac sprain on March 14, 2001, and (3) she had a five percent permanent partial impairment because of a sacroiliac sprain. He believed Clark was capable of at least light duty work.

## II. Proceedings.

On November 28, 2000, Clark filed a notice and petition with the workers' compensation commissioner seeking benefits from Vicorp and its carrier, Kemper Insurance Company (hereinafter collectively employer), because of the alleged work-related injury of July 7, 2000. Following an arbitration hearing, a deputy commissioner found that an injury occurred on July 7, 2000 that arose out of and in the course of employment, Clark's condition is causally related to that injury, and that sixty weeks of temporary total disability compensation benefits should be paid to Clark. In making these findings, the deputy gave greater weight to Dr. Hillman's opinion because she had more contact with Clark than the other doctors, Dr. Hillman specializes in rehabilitation, and Dr. Ban's report corroborates her report regarding medical causation.

Following the ruling, Clark filed a motion to amend decision and motion for reconsideration, and the employer filed a motion for a nunc pro tunc order to correct the number of weeks awarded from 60 weeks to 35.857 weeks. In her motion, Clark alleged that the deputy did not address the issue of whether she was entitled to permanent partial disability compensation benefits, an issue the deputy identified at the beginning of the arbitration decision. Clark also alleged that she requested permanent partial disability compensation benefits because the employer terminated her employment due to work restrictions resulting from her injuries.

The deputy granted the motion for a nunc pro tunc order but denied the motion to amend and for reconsideration, noting that she had addressed the issue in her arbitration decision.

Clark filed an intra-agency appeal from the ruling on her motion. The deputy workers' compensation commissioner found that the hearing deputy had indeed addressed the issue of whether Clark was entitled to permanent partial disability compensation benefits. The deputy com-

missioner affirmed and adopted the hearing deputy's decision as final agency action.

Clark then filed a petition for judicial review, seeking a district court ruling reversing the agency appeal decision that failed to award Clark permanent partial disability compensation benefits. The district court affirmed the agency's decision.

Clark appealed and we transferred the case to the court of appeals. That court reversed and remanded because of its concern that the agency may have overlooked the evidence of Clark's termination on the issue of whether she was entitled to permanent partial disability compensation benefits. The court noted that the commissioner's decision had no reference to the employer's termination of employment.

We granted the employer's application for further review.

### III. Issue.

The sole issue is whether the commissioner correctly decided that Clark is not entitled to permanent partial disability compensation benefits.

### IV. Scope of Review.

 Iowa Code chapter 17A governs judicial review of decisions of the workers' compensation commissioner. Iowa Code § 86.26 (2003).

In exercising its judicial review power, the district court acts in an appellate capacity. In reviewing the district court's decision, we apply the standards of chapter 17A to determine whether the conclusions we reach are the same as those of the district court. If they are the same, we affirm; otherwise we reverse.

*Mycogen Seeds v. Sands*, 686 N.W.2d 457, 463–64 (Iowa 2004) (citations omitted).

Clark's arguments on appeal deal with whether there was substantial evidence to support the commissioner's decision, whether the commissioner made an error of law, and whether the commissioner correctly applied the law to the facts. The following provisions of chapter 17A are therefore relevant:

The court may affirm the agency action or remand to the agency for further proceedings. The court shall reverse, modify, or grant other appropriate relief from agency action, equitable or legal and including declaratory relief, if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is any of the following:

. . . .

c. Based upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency.

. . . .

f. Based upon a determination of fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole. For purposes of this paragraph, the following terms have the following meanings:

(1) *"Substantial evidence"* means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

. . . .

m. Based upon an irrational, illogical, or wholly unjustifiable application of law to fact that has clearly been vested

by a provision of law in the discretion of the agency.

Iowa Code § 17A.19(10)(c), (f)(1), (m).

■ Because the agency here has not been vested with the final authority to interpret the law by which permanent partial disability compensation benefits are awarded, we do not defer to the agency's interpretation of such law and are free to substitute our judgment de novo for the agency's interpretation. *See* Iowa Code § 17A.19(10)(c), (11)(b); *Mycogen Seeds*, 686 N.W.2d at 464.

■ The factual findings regarding the award of benefits are within the agency's discretion, so in this case we are bound by the agency's findings of fact if supported by substantial evidence. *See* Iowa Code § 17A.19(10)(f); *Mycogen Seeds*, 686 N.W.2d at 464–65. Because factual determinations are within the discretion of the agency, so is its application of law to the facts. *Mycogen Seeds*, 686 N.W.2d at 465. So here we can only reverse the agency's application of the law to the facts if we determine such an application was "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(m); *Mycogen Seeds*, 686 N.W.2d at 465.

## V. Analysis.

■ The deputy hearing officer awarded Clark temporary total disability compensation benefits. Iowa Code section 85.33(1) governs temporary total disability compensation benefits. This provision provides that the employer shall pay the employee such benefits "until the employee has returned to work or is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first." Iowa Code § 85.33(1).

■ Temporary total disability compensation benefits and healing-period compensation benefits refer to the same condition. *Ellingson v. Fleetguard, Inc.*, 599 N.W.2d 440, 446 (Iowa 1999). Healing-period compensation benefits are governed by Iowa Code section 85.34(1). Such benefits are payable

> until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first.

Iowa Code § 85.34(1).

The difference between temporary total disability compensation benefits and healing period compensation benefits

> involves permanent partial disability. If permanent partial disability results, the payments made prior to payment for permanency are healing period benefits. Healing period benefits accrue from the first day following the injury or the occurrence of injury. When an injury does not result in a permanent disability, the payments made are called "temporary total disability benefits." Payments for temporary total disability accrue from the fourth day of the disability; however, the first three days are paid for if the temporary total disability lasts more than fourteen days.

Arthur C. Hedberg, Jr. & Phillip Vonderhaar, *An Overview of the Iowa Workers' Compensation Act*, 30 Drake L. Rev. 809, 825–26 (1980–81) (footnotes omitted) [hereinafter Hedberg]; *see also* Iowa Code §§ 85.32, 85.33(1)–(2), 85.34(1). Because the commissioner found that Clark did not suffer permanent partial disability, temporary total disability compensation benefits were awarded rather than healing-period compensation benefits.

Temporary total disability compensation benefits and healing-period compensation

benefits are made to partially reimburse the employee for the loss of earnings while the employee is recuperating from the condition the employee has suffered. Hedberg, 30 Drake L. Rev. at 825.

Iowa Code section 85.34(2) governs payment of permanent partial disability compensation benefits, which is what Clark is seeking. Such benefits begin at the termination of healing period compensation benefits. Iowa Code § 85.34(2).

 Permanent partial disabilities have been divided into either a scheduled or unscheduled loss. *St. Luke's Hosp. v. Gray*, 604 N.W.2d 646, 653 (Iowa 2000); see Iowa Code § 85.34(2). Clark is claiming an unscheduled loss. For an unscheduled loss, the employee's industrial disability must be determined. *Sherman v. Pella Corp.*, 576 N.W.2d 312, 320–21 (Iowa 1998). Industrial disability measures an employee's lost earning capacity. *Id.* at 321. Several factors are considered in determining such loss. *Id.* These include the employee's functional impairment, age, education, work experience, qualifications, ability to engage in similar employment, and adaptability to retraining to the extent that any factor affects the employee's prospects for relocation in the job market. *Id.*; *Gray*, 604 N.W.2d at 653.

 "The focus is not solely on what the worker can or cannot do; industrial disability rests on the ability of the worker to be gainfully employed." *Myers v. F.C.A. Servs., Inc.*, 592 N.W.2d 354, 356 (Iowa 1999). A comparison of actual earnings before and after the injury is important to the earning capacity analysis. *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 266 (Iowa 1996). Showing that the employee's actual earnings have decreased is not always necessary "to demonstrate an injury-caused reduction in earning capacity." *Gray*, 604 N.W.2d at 653.

As mentioned, the hearing deputy gave several reasons why she accorded Dr. Hillman's opinion greater weight on causation and extent of injury than the other doctors who had seen Clark. On the extent of injury, Dr. Hillman opined that Clark's injury was a *temporary* exacerbation of her preexisting condition. Significantly, Dr. Hillman did not assign a permanent partial disability rating to Clark's condition because, as the hearing deputy found, Dr. Hillman did not believe Clark had sustained a permanent partial disability. The deputy commissioner adopted that finding, and we conclude there was substantial evidence to support it.

Nevertheless, Clark contends that the hearing deputy, the deputy commissioner, and the district court erred in rejecting her contention that her employer's termination of her employment demonstrated an injury-caused reduction in earning capacity. In support of this contention, Clark argues that Dr. Hillman's work restrictions that were imposed because of her work-related injury led to the termination of her employment.

In briefs to the hearing deputy, deputy commissioner, district court, and appellate courts, Clark has relied heavily on two cases to support her position: *Blacksmith v. All–American, Inc.*, 290 N.W.2d 348 (Iowa 1980) and *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181 (Iowa 1980).

In *Blacksmith*, the claimant had been a truck driver and was demoted to a dock job, which paid substantially less. 290 N.W.2d at 350. Despite the fact that one of the doctors doubted any permanent disability resulted from a phlebitis attack, the employer disqualified the claimant from any truck driving and transferred him to a lower-paying job. *Id.* at 349–50. This court reversed and held as a matter of law that the claimant had proven the injury was a proximate cause of his reduced earn-

ing capacity. *Id.* at 354. In reaching that conclusion, the court held:

> Blacksmith did incur an increased industrial disability and is not barred from recovery by failure to prove an increased functional disability of his leg. This is the case of an employee who has no apparent functional impairment and who wants to work at the job he had before but is precluded from doing so because his employer believes the past injury disqualifies him, resulting in a palpable reduction in earning capacity. The extent of Blacksmith's industrial disability is an issue of fact for the commissioner to resolve.

*Id.* (citation omitted).

In *McSpadden,* this court recognized the principle that an employer's refusal to give any sort of work to a claimant after the claimant suffers a work-related injury may justify an award of disability. 288 N.W.2d at 192. The court also recognized that a claimant's inability to find other suitable work after making bona fide efforts to find such work may provide grounds for relief. *Id.*

Here, the employer had a company policy that provided for a maximum of 180 days of leave time and that a leave of absence beyond that time would result in termination of employment. Clark's 180 days ended on January 3, 2001. Dr. Hillman released Clark to light duty work on December 22, 2000 with work restrictions. Clark notified her employer of the release on December 26, 2000, but the employer refused to accept the release and terminated her employment on January 4, 2001 *because she failed to return to work within the 180–day time limit.*

Clark's job description included physical requirements of "[l]ifting and carrying 25# and 60# maximum, pushing, pulling 250# maximum," which were well beyond the restrictions imposed by Dr. Hillman.

In a letter responding to Clark's attorney, the employer noted these lifting requirements from which Clark was significantly restricted. The employer also noted that Dr. Hillman had identified the restrictions as temporary in nature. Although Clark disputes the restrictions were temporary, Dr. Hillman's letter of January 2002 suggests the restrictions were indeed temporary when she wrote: "As [the imposition of work restrictions based upon a functional capacity exam] has been over a year, if there are questions about permanent work restrictions, the possibility of repeating the functional capacity exam to determine safe techniques at this time could be entertained." The employer concluded its letter to Clark's attorney by advising him that after Clark's condition stabilized for a permanent rating, the employer would reconsider her for employment if she could meet the essential functions of the job with some type of reasonable accommodation.

These facts demonstrate two things. First, the employer terminated Clark's employment because she did not return to work within the 180–day time limit. The reason she could not return to work within 180 days was because she could not perform all of the job requirements within that time period. Second, the employer terminated Clark's employment pursuant to company policy long before the healing of her temporary condition and left open the possibility of rehire with some reasonable accommodation. So there was no indication on the part of the employer that it would under no circumstances rehire Clark because of the work restrictions or that the employer thought the work restrictions were permanent. In fact, in its letter of termination, the employer advised Clark that when she was able to return to work she should contact her general manager.

## VI. Disposition.

In sum, there was substantial evidence to support the agency's finding that Clark

did not suffer a permanent partial disability. In reaching that conclusion, the agency properly applied the law to the facts. Therefore we cannot say that its decision was irrational, illogical, or wholly unjustifiable. Consequently, the district court was correct in upholding the agency's decision. We therefore vacate the court of appeals decision and affirm the district court judgment.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**