**IN THE COURT OF APPEALS OF IOWA**

No. 14-2121
Filed April 6, 2016

**PELLA CORPORATION,**
    Plaintiff-Appellant,

**vs.**

**CHARLIE MARSHALL,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

An employer challenges the commissioner's causation finding and award of benefits, medical expenses, and costs to an injured worker. **AFFIRMED AND REMANDED.**

David L. Jenkins of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

Martin Ozga of Neifert, Byrne & Ozga, P.C., West Des Moines, for appellee.

Heard by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, Presiding Judge.**

Employer Pella Corporation appeals a district court order affirming the decision of the workers' compensation commissioner that a forklift accident caused a rotator cuff tear in Charlie Marshall's right shoulder and that Marshall was entitled to an award of twenty percent industrial disability. Pella also claims "issues related to independent medical examination and costs must be reversed." Because we agree with the district court on medical causation and loss of earning capacity, we affirm. The matter is remanded to the commissioner for a determination of medical expenses and costs as ordered by the district court.

### I. Facts and Prior Proceedings

Marshall worked for Pella for thirty-six years, performing numerous manual-labor jobs with varied physical demands from 1972 until he retired. In the 1990s, Marshall received treatment for work-related bilateral carpal tunnel syndrome and for a non-work-related rotator cuff tear of his left shoulder. Marshall is left handed and, after a surgical repair by Dr. Scott Neff, was able to return to work and perform his previous duties.

On September 24, 2007, sixty-three-year-old Marshall was struck by a forklift at work. The impact threw him about seven feet. He landed on his hands, right arm, right side, and face. Marshall was taken to the Pella Regional Health Center by ambulance, where emergency room personnel diagnosed him with a laceration to his right eyebrow, requiring sutures, as well as contusions to his right chest and right hand.

The next day, Marshall was seen by Dr. Lloyd Thurston, the company doctor and an occupational physician. Dr. Thurston noted normal range of

motion in both shoulders. Dr. Thurston took Marshall off work, hoping "to release him to full normal duty" on October 1, and instructed him to use his hands and wrists frequently "to start decreasing the swelling and bruising." On his next two visits, on September 27 and October 1, Dr. Thurston noted Marshall was experiencing pain but nothing specific to his right shoulder. Dr. Thurston released Marshall to unrestricted work on October 1.

When Marshall and his wife met with Dr. Thurston on October 5, Marshall complained of pain in his right shoulder for the first time, as well as left-wrist issues and anxiety episodes at work. Marshall's right-shoulder pain had interfered with his sleep on the previous two nights, i.e., October 3 and 4, nine days after the impact and two days after returning to unrestricted work. Dr. Thurston noted Marshall had struck his right shoulder in the inciden,t and Marshall mentioned his previous rotator cuff tear of the left shoulder. Dr. Thurston noted that because Marshall believed his prior doctor had been slow to recognize the rotator cuff tear in his left shoulder, Marshall wanted to ensure Dr. Thurston did not miss a similar tear in his right shoulder. Upon examination, Dr. Thurston found Marshall's shoulder range of motion "essentially normal" and also found no bruising, redness, or localized tenderness. Stating he was at a loss to explain the cause of the right-shoulder pain, Dr. Thurston opined Marshall's shoulder-pain complaints "were a cry for help, in the fact that he is still somewhat emotionally traumatized by the injury." Dr. Thurston continued Marshall on pain medications but also sent him to a physical therapist who could evaluate and treat Marshall's right shoulder.

Marshall reported to physical therapy on October 8. The therapist found decreased strength, range of motion, and functional mobility of the right upper extremity "secondary to fall." Marshall rated his pain at four out of ten, after having taken Tylenol. When Marshall performed heavy work in the mornings without Tylenol, his shoulder pain was ten out of ten. The next day's notes from therapy show Marshall was feeling slightly better but his pain increased as he performed certain movements at work. At his October 16 therapy session, Marshall stated, when he is resting, he has "almost no" pain but his pain increases to a level four with certain work activities. In contrast, Dr. Thurston's notes from the same day state Marshall's right shoulder is normal with "full range of motion and no pain." Although Dr. Thurston assessed an "essentially resolved" right shoulder sprain, he ordered one more week of physical therapy.

During therapy on October 24, Marshall had guarded movement of his right upper extremity. He could not relax during passive stretching. The therapist observed an increase in soft tissue restriction of the right subscapularis as well as increased signs of impingement on the movement of his right upper extremity. Marshall reported trouble sleeping the previous night due to intense shoulder pain.

At his October 30 therapy session, Marshall rated the shoulder pain as three out of ten, stating his shoulder was "much better." But this improvement had reversed by his November 1 therapy session; his shoulder started to hurt intensely by mid-afternoon at work until he took pain medication. Marshall stated his shoulder only hurt during work. The next day, November 2, the therapist noted Marshall had been continually stating "he feels he has a 'torn rotator cuff.'"

Dr. Thurston's November 5, 2007 notes state: "Most of the discomfort in his right shoulder has resolved." While Dr. Thurston assessed an "[e]ssentially resolved right shoulder contusion," he ordered two more weeks of physical therapy. The therapist's November 6 notes indicate Marshall showed signs of improvement, with overall pain of zero. Marshal reported no pain in the right shoulder during his therapy on November 7, November 13, and November 15. The therapist discharged Marshall from therapy on November 15, stating he had met all goals and was displaying normal scapular stability. The therapist noted Marshall could now do all his shoulder exercises independently "and is motivated to continue with the program" after discharge.

On November 26, 2007, Dr. Thurston noted his continued concern Marshall was suffering from post-traumatic stress disorder (PTSD), stating he was basically "symptom free" after responding well to physical therapy for his shoulder, ribs, and wrists. Dr. Thurston referred Marshall to Dr. James Gallagher for an evaluation of possible PTSD. Dr. Thurston also issued a status report stating "resolved shoulder sprain" and discharging Marshall from care without restrictions. He indicated "no permanent impairment anticipated." Marshall had already been working without restrictions.

In early December, Dr. Gallagher sent a letter to Dr. Thurston reporting an impression of post-traumatic stress reaction manifesting in hypervigilance about forklifts, strong reactions to honking horns, and a fear of operating motor vehicles. He noted Marshall's wife planned to do the driving on their upcoming trip to Virginia. Dr. Gallagher stated: "Mostly, the physical injuries have resolved,

although you [Dr. Thurston] have some concerns about his somatic preoccupation."

Marshall performed his work at Pella without requesting additional medical treatment. Pella granted Marshall's request for a January 2008 leave of absence during its slower production in the winter months. Marshall and his wife visited his nephew's church camp in Virginia, staying in hotel-like accommodations. Marshall's wife did almost all of the driving and carried the luggage.

Upon his return to Iowa, Marshall saw Dr. Gallagher on February 7, 2008, reporting improved mental health but continued pain in his right arm. On the same day, Marshall reported pain in his right shoulder to Pella's nurse, who referred him back to Dr. Thurston. After meeting with Marshall on February 21, Dr. Thurston noted the following history:

> [Marshall] describes this pain over his right upper arm as a feeling of coldness that starts in the upper arm and then spreads into the shoulder, it seems to be totally unrelated to activity or inactivity. Nothing he does seems to help the pain resolve. It just comes and goes. He was on [leave of absence] for four weeks in Virginia, had an excellent time, and his symptoms progressed even in Virginia, now he has been back to work for three weeks, doing his regular job and the symptoms, according to him, seem to be increasing in severity.

Dr. Thurston found Marshall had a normal range of motion in his shoulder and normal upper extremity strength and reflexes. Dr. Thurston recommended Pella send Marshall to a pain specialist as a more appropriate course of treatment than having him evaluated by an orthopedist. He further noted: "I think there is a very good likelihood that the pain specialist won't find anything and that [Marshall] may or may not benefit from medication, but at least that would bring this case to

a close." Instead of following Dr. Thurston's recommendation, Pella opted to have Marshall seen by orthopedic surgeon Dr. Scott Neff.

Dr. Neff examined Marshall, noting he had landed on his right shoulder and had been complaining of right-shoulder pain since the work accident, with the pain especially problematic at night. Dr. Neff observed Marshall's "rotator cuff is weak to elevation" and his shoulder injury was consistent with the work accident. Based on the mechanism of injury and Marshall's continued shoulder pain, Dr. Neff ordered an MRI scan, which showed "a full thickness rotator cuff tear of the supraspinatus and some tear involving the infraspinatus, as well."

On May 23, 2008, Pella's claims representative contacted Dr. Neff for an opinion on causation, but provided him with misleading information that Marshall spent January 2008 traveling and camping, even though Marshall stayed in accommodations similar to a hotel. The representative also told Dr. Neff that Marshall's pain "returned" after his "lengthy vacation" and Marshall had been "pain free and treatment free since November 2007." Dr. Neff checked "no" on the causation-nexus blank at the bottom of the representative's letter.

Dr. Neff also responded with a July 2008 letter stating Marshall "does have a full thickness rotator cuff tear," noting "this can occur naturally, simply with the passage of time" without being related to an injury, and such tears are very common in sixty-year-olds. But Dr. Neff also stated: "Activity can increase the underlying symptom complex, but simple activity oftentimes does not cause the problem." Based on the information sent by the claims representative, Dr. Neff opined the injury to Marshall's right shoulder was not work related. Thereafter, Pella sent Marshall a letter declining to pay for the proposed shoulder surgery.

In August 2008 Marshall saw Dr. Galyn Vande Zande, his primary care physician. Dr. Vande Zande explained Marshall had no history of problems with his right shoulder and opined Marshall's rotator cuff tear was caused by the forklift incident and not by advancing age. Dr. Vande Zande reported: "The family also noted that they had asked for the possibility of an MRI earlier because they knew symptoms were similar to what he had in 1995 when he hurt his left shoulder. No MRI was performed at that time." Pella responded with a September 2008 letter to Marshall, stating it had reviewed Dr. Vande Zande's medical report and "we are remaining firm in our denial of the compensability" of shoulder surgery.

Marshall continued to perform his regular duties at Pella until January 3, 2009, when he retired five months before age sixty-five so he could take advantage of an early retirement incentive program. Marshall then worked part time for about ninety days performing janitor duties at a hospital. Marshall left this job for reasons unrelated to his right shoulder. Marshall has not sought employment since that time.

Marshall filed a petition seeking worker's compensation benefits on September 3, 2009. Dr. Vande Zande referred Marshall to orthopedic surgeon Kyle S. Galles, who noted the MRI showed "a full thickness" rotator cuff tear and who opined the forklift incident "was a significant contributing factor to him continuing to have right shoulder girdle pain that has not resolved despite appropriate conservative treatment and modalities for the past year." Dr. Galles found it significant Marshall had seen Dr. Vande Zande shortly before the work incident and had "no shoulder pain at all. The fact that with some physical

therapy for a short bit of time the shoulder may have felt a bit better is not uncommon with a moderate size rotator cuff tear as well." Dr. Galles's November 2009 letter reiterated these opinions. Dr. Galles operated on Marshall's right shoulder in April 2010 and provided a postoperative diagnosis of "right rotator cuff tear with impingement and AC joint arthritis with a small rotator cuff tear." Marshall underwent more physical therapy.

The agency required the parties to serve requests for independent medical examinations (IMEs) sixty days before the upcoming August 2010 arbitration hearing. At Marshall's request, Dr. Robin Epp conducted an IME on June 17, 2010. After a review of the medical records and a discussion of the history with Marshall, Dr. Epp's July 2010 report opined Marshall's rotator cuff injury and surgical repair were "directly and causally related" to his September 2007 injury.

On July 21, 2010, the parties filed a joint motion to continue the August hearing. The parties noted Dr. Epp did not anticipate Marshall would reach maximum medical improvement (MMI) until a later date, Dr. Galles "has made no prediction as to MMI date," and Pella would "likely require several months" to conclude its discovery. The agency granted the joint motion on August 3. Dr. Galles released Marshall to normal activities as tolerated on August 11, 2010. The record does not contain any reports or evaluations by Pella over the following four months.

On January 4, 2011, doctor of physical therapy Mark Blankespoor conducted a functional capacity evaluation (FCE) at Marshall's request and reported Marshall could perform "medium" work but had lost some strength and

range of motion in his right shoulder. DPT Blankespoor limited Marshall from performing the heavier aspects of the work he had done at Pella. Also at Marshall's request, Dr. Epp conducted a second IME on January 19, 2011; her February 2011 report found impairment rated at three percent of the "right upper extremity" converted to a two percent "impairment of the whole person." Dr. Epp set permanent work restrictions.

As aptly found by the deputy, "Dr. Galles's opinion subsequently proved susceptible to massage." After a conference with defense counsel, Dr. Galles signed counsel's March 2011 letter stating he could no longer opine the work incident "caused" the rotator cuff tear or "substantially aggravated" any rotator cuff tear. Dr. Galles agreed to a "possibility" the work incident caused Marshall's shoulder pain from October to November 2007, which "seemingly resolved" by late November 2007. Then after a meeting with Marshall's counsel, Dr. Galles's April 2011 letter stated, if Marshall "continued to have difficulties" with his right shoulder "from November 2007 through January of 2008," his work injury "was a substantial contributing factor to the rotator cuff tear" and surgery.

The parties stipulated Marshall sustained a traumatic work injury on September 24, 2007. Marshall filed an itemization totaling $4155.54: filing fee ($100); service costs ($5.54); July 2010 Dr. Epp IME ($2200); January 2011 FCE ($900); February 2011 Dr. Epp IME ($800); and Dr. Galles's April 14, 2011 report ($150).

Marshall's brief claimed Dr. Epp's second IME should be considered a continuation of the first IME because he needed to obtain the first IME to meet the August hearing's discovery deadlines. He requested Dr. Epp's IME

expenses be paid under Iowa Code section 85.39 (2011), which provides, if "an evaluation of permanent disability has been made by" the employer's physician and "the employee believes this evaluation is too low, the employee shall . . . be reimbursed by the employer the reasonable fee for a subsequent examination" by the employee's physician. Marshall also asked the commissioner to award the expense of the FCE report and Dr. Galles's report as costs under Iowa Admin. Code r. 876—4.33(6), which provides, costs taxed by the commissioner "shall be" "the reasonable costs of obtaining no more than two doctors' or practitioners' reports."[1]

Pella's brief claimed Dr. Epp's reports were not reimbursable because the condition precedent of a permanent disability evaluation by the employer had not been met. If the agency found otherwise, Pella claimed section 85.39 only authorized reimbursement for one employee IME, so it was not obligated to reimburse Marshall for Dr. Epp's second IME. Pella also disputed reimbursement of the FCE but acknowledged Dr. Galles's $150 report expense "could be subject to taxation as a reasonable cost."

Pella's brief also challenged some of Marshall's medical expenses, listed in his Exhibit 40, as either not related to the injury or unreasonable in amount. Marshall responded all his itemized billings were "related" to Marshall's shoulder

---

[1] Marshall alternatively asked for Dr. Epp's IME expenses to be taxed as a report cost under rule 876—4.33(6). This route for recouping a claimant's IME expense has been foreclosed by a recent ruling of our supreme court. *See Des Moines Area Reg'l Transit Auth. v. Young,* 867 N.W.2d 839, 841-42 (Iowa 2015) (differentiating between a "reimbursable" IME that met the conditions precedent set out in section 85.39 and hearing costs awarded in the discretion of the commissioner under rule 876—4.33(6)). In any event and even with the procedural twists and turns of this case, at all levels of adjudication Pella has been ordered to pay the cost of the first IME only under Iowa Code section 85.39 and not as a report cost under rule 876—4.33(6).

injury, with the "possible exception of the stress-echo test." But Marshall claimed that test was still compensable as "necessary" in determining whether "surgery could proceed."

***Arbitration Decision***. At the May 2011 arbitration hearing, the primary issue was whether Marshall could prove his right shoulder injury, need for treatment, and subsequent periods of disability were causally related to the stipulated work incident and not some other source. Marshall testified in person and his wife testified by telephone. Marshall disagreed with Dr. Thurston's opinion his shoulder problem had resolved in November 2007. Marshall pointed out he still had aches and pains in his right shoulder after his November 2007 discharge from physical therapy. Marshall's wife testified similarly.

The deputy's October 2011 arbitration decision recognized the expert opinions were "mixed" and concluded Marshall had failed to prove a nexus between his September 2007 work injury and his surgical condition. The deputy found the issues of industrial disability and Pella's obligation to pay for medical expenses were moot. The deputy noted Marshall sought reimbursement for "one or two" IMEs by Dr. Epp under Iowa Code section 85.39. Recognizing (1) a rating of no impairment is a rating of impairment and (2) a section 85.39 evaluation is "reimbursable irrespective of whether" the employee established the injury "arose out of and in the course of employment," the deputy deemed Dr. Thurston's November 2007 release of Marshall from treatment without restriction or rated impairment "a previous evaluation of permanent disability." Explaining our supreme court has interpreted section 85.39 to limit an injured worker to one IME," the deputy ordered Pella to reimburse Marshall for Dr. Epp's first

evaluation but not her second, "nor is the same awarded as a cost." The deputy ordered costs, except the second IME, taxed to Pella.

Pella filed a rehearing application, requesting reconsideration of (1) the deputy's determination Dr. Thurston's November 2007 release constituted an employer's "previous evaluation" under section 85.39 and the corresponding agency order that Pella reimburse Marshall for Dr. Epp's first IME, and (2) the "order directing taxation of costs to Pella." Pella agreed it was not required to reimburse the cost of the second IME. Marshall resisted, pointing to Dr. Thurston's statement, "no permanent impairment anticipated," on the form discharging Marshall from in November 2007 and explaining "Dr. Thurston never made an attempt to clarify his assertion that a permanent impairment was not anticipated in the year and a half between the 11/26/07 report and Dr. Epp's July 2010 [first] IME." Marshall also pointed out Dr. Neff had checked a box in his May 23, 2008 letter stating Marshall's injury was not work related, "thus indicating [Marshall] had no impairment from his work injury."[2]

Pella's application for rehearing was denied by the operation of time.

***Appeal Decision.*** Marshall filed an intra-agency appeal, challenging the deputy's rulings on causation and industrial disability. He asked the commissioner to order reimbursement of Dr. Epp's first IME, payment of the Exhibit 40 medical expenses, and payment of costs, including the full cost of the FCE. Pella answered and filed a cross-appeal from the "deemed denial" of its

---

[2] In their briefs, the parties also addressed whether the full FCE expense was a report cost under rule 876—4.33, advancing arguments similar to the arguments advanced by the claimant and employer in *Young*, 867 N.W.2d at 842-44. This determination awaits the commissioner on the second remand ordered by the district court and affirmed by this court in our later analysis.

application for rehearing, arguing it was not required to pay for Dr. Epp's evaluation or the FCE. Pella concluded: "If any taxation of costs against Pella had been appropriate, only the costs of filing fee, service costs, and $150 for Dr. Galles's report could be properly taxable."

On February 8, 2013, the commissioner reversed the deputy, finding on de novo review that Marshall's right shoulder injury was casually related to the work incident. In the appeal decision, the commissioner awarded Marshall a twenty percent loss of industrial disability. The commissioner found Pella's cross-appeal issues were moot. The commissioner ordered Pella to pay Marshall's medical expenses under section 85.27, costs of the action, and costs of the appeal, including the cost of preparing the hearing transcript. *See* Iowa Code § 85.27 (requiring, in part, the employer to furnish reasonable surgical, medical, and physical rehabilitation services for compensable injuries).

***Commissioner Rehearing Decision.*** Pella filed for rehearing, claiming in part, the commissioner erred by failing to more fully address medical expenses, IME expenses, and taxation of costs and by failing to rule on Pella's cross-appeal challenges (first IME and FCE). Marshall's responded those issues "were considered at length in the appeal decision (and in the case of costs in the arbitration decision) and were rejected." Because Marshall had not asked the commissioner to award the cost of the second IME, he claimed the commissioner's appeal decision, like the deputy's arbitration decision, did not award that cost. To the extent the second IME remained in controversy, Marshall asked the commissioner to "modify" the appeal decision to specify the commissioner's "award of costs" did not include the costs of the second IME.

On March 7, 2013, the commissioner denied Pella's rehearing application, reiterating that he considered "the totality of the medical and lay evidence" and concluded that Marshall had proven his right-shoulder rotator cuff tear was caused by his traumatic injury in September 2007. Because the commissioner did not provide additional analysis on the IME expense, the commissioner's award of costs in the appeal decision did not include the cost of the second IME, only the cost of the first IME.[3]

*District Court Remand Decision.* Pella sought judicial review, and the district court remanded "to the agency for a new decision on the record already made." The court framed the remand question as whether Marshall's "history as contained within his medical records (which suggests that his right shoulder symptoms resolved in November 2007) or his testimony at hearing (along with that of his wife) shall control for purposes of the factual predicate" for the medical opinions. The court instructed the agency:

> This decision would include not only the issue of [causation], but also in the event that question is answered in the affirmative, whether [Marshall] has sustained a loss of industrial disability. In addition, the agency should also address the issue of the proper assessment of medical expenses, expenses associated with [Marshall's IMEs], and the taxation of costs, as none of these issues properly raised by [Pella] in its cross-appeal [of the deputy's arbitration decision] were addressed by the commissioner in his appeal decision.

---

[3] Marshall included the separate expense of each IME in his itemization of costs. Marshall did not ask the commissioner to award the second IME on intra-agency appeal. The commissioner's appeal decision ordered Pella to pay costs, and Marshall's cost itemization included the expense of the first IME. Accordingly, we find no merit to Pella's claim in this appeal that the commissioner's appeal decision "eliminated" the award of the first IME and that Marshall had failed to preserve error by not filing a cross-appeal.

***Commissioner Remand Decision.*** In his April 2014 ruling, the commissioner first recognized the remand court's directive for the agency "to make specific credibility findings consistent with the record." The commissioner noted the presiding deputy did not make specific credibility findings and did not refer to the demeanor of any witness—"meaning the deputy made no observation of [Marshall's] behavior at the hearing which was included in the arbitration decision findings." Accordingly, the commissioner found no reason to give "specific deference" to the presiding deputy on any credibility determination.

In his findings of fact, the commissioner extensively discussed the medical records and found Marshall's October 5, 2007 report of shoulder pain to Dr. Thurston was consistent with the testimony of Marshall and his wife that Marshall was in a great deal of pain generally after the forklift accident and only specifically noted shoulder pain later to his doctor. The commissioner observed Dr. Thurston's October 15 notes fail "to address the pain complaints noted in the same time frame to the physical therapist. Apparently, despite normal range of motion and no pain, Dr. Thurston ordered another week of physical therapy." During October and November of 2007, Marshall "would report varying levels of pain in his shoulder—a waxing and waning of pain complaints."

The commissioner also found the later opinions of Dr. Neff and Dr. Galles were influenced by the parties' lawyers, with both doctors' initial assessments being Marshall had sustained a rotator cuff tear consistent with the mechanism of injury described to them by Marshall.[4] The commissioner stated: "The

---

[4] While Pella correctly asserts in this appeal that the record does not show its attorney influenced Dr. Neff, it is undisputed Pella's claims administrator provided misleading

mechanism of injury—that [Marshall] was struck by the forklift and sustained a violent fall—is not disputed."

In his conclusions of law, the commissioner recognized a discrepancy between the medical records and the testimony from Marshall and his wife as to whether Marshall suffered "continual shoulder pain." But the commissioner concluded "the totality of the record of evidence supports a finding of causation between the workplace injury and [Marshall's] torn rotator cuff." The commissioner observed "Dr. Thurston's notes failed to identify shoulder pain on dates when Marshall reported such pain to physical therapy and such complaints were contained within the therapy notes." The commissioner highlighted the opinion of Dr. Vande Zande that a person "with a mild rotator cuff tear could be asymptomatic for a short period of time with physical therapy" and also pointed out Dr. Galles's view supported this theory concerning "reports of pain." The commissioner recognized Marshall's traumatic injury was so serious that it caused symptoms of PTSD. Further, Marshall initially reported the most obvious areas of pain and shortly thereafter began to report pain in his right shoulder, in circumstances where (1) Dr. Vande Zande had noted Marshall did not have any previous right-shoulder pain and (2) there was no "intervening injury."

The commissioner concluded: "Other theories of injury were asserted and were suggested to medical providers, but are specifically found unconvincing and

_____

information regarding Marshall's camping that served as one factor influencing Dr. Neff. Thus, while a more accurate statement by the commissioner would be the later opinions of Dr. Neff were influenced by Pella's claims administrator and the later opinions of Dr. Galles were influenced by the lawyers, the differing identity of the person exerting influence on Dr. Neff does not affect the validity of the commissioner's overall conclusion.

unsupported. Pella attempted to create an allusion of injury by suggesting [Marshall] strained his shoulder 'camping' during his leave of absence," but the commissioner ruled there was no credible evidence in the record that Marshall was engaged in anything but "simple activity" during his January 2008 leave of absence. Further, as reported by Dr. Galles, Marshall "noted 'improvement a bit' the month he was away from work, but was reevaluated for pain following the return to production work." The commissioner found further support in Dr. Thurston's February 21, 2008 note stating Marshall was "doing his regular job and the symptoms, according to him, seem to be increasing in severity." The commissioner determined Marshall's "pain was not constant and intolerable . . . but varied with his activities and also with physical therapy and medication. The records evince that while the extent of pain varied, the pain never completely and permanently resolved."

The commissioner gave greatest weight to the medical opinions predicated on Marshall's ongoing shoulder pain, the absence of a prior right shoulder condition, and the severity of Marshall's traumatic injury. Specifically, the "best and most reliable evidence [of causation] are the initial assessments of Dr. Galles and Dr. Neff and the consistent opinions of Dr. Vande Zande and Dr. Epp." The commissioner specifically found Dr. Thurston's view not credible—"his opinion was based upon his misdiagnosis/mischaracterization" of Marshall's right shoulder condition—a diagnosis proven incorrect when Dr. Neff finally detected a torn rotator cuff in Marshall's right shoulder. After concluding Marshall's stipulated injury was casually related to the rotator cuff tear in his right shoulder, the commissioner adopted his prior award of industrial disability.

Stating the one remaining issue on remand was Dr. Epp's IME expense, the commissioner spent several paragraphs discussing and resolving Pella's challenges. The commissioner first noted section 85.39 permitted Marshall to be reimbursed for a subsequent examination by a physician of his choosing where "the employer-retained physician has previously evaluated 'permanent disability'" and Marshal believed the disability finding was too low. The commissioner recognized a "rating of no impairment is a rating of impairment" under longstanding agency precedent. The commissioner explained that section 85.39(1) permitted Marshall to recover his reasonably necessary transportation expenses and any wages he lost while attending his IME examination, and (2) limited Marshall to one IME at Pella's cost, citing *Larson Manufacturing. Co. v. Thorson*, 763 N.W.2d 842, 861 (Iowa 2009).

Applying the law, the commissioner ruled: "Dr. Thurston's release of Marshall from treatment without restriction or finding of impairment in November of 2007 as well as Dr. Neff's opinion in July of 2008 is deemed a previous evaluation of impairment" consistent with precedent. The commissioner explained Marshall was entitled "to one examination under Iowa Code section 85.39. The deputy correctly awarded the first of Dr. Epp's examinations, but not the second."[5] *See Thorson*, 763 N.W.2d at 861.

---

[5] Based on the quoted language, we find no merit to Pella's claim in this appeal that the remand decision is "unclear" as to whether the commissioner ordered reimbursement of the second IME.

Finally, the "division, on remand, reaffirms the liability finding of [Pella] for [Marshall's] medical treatment costs pursuant to Iowa Code section 85.27, as set forth on page fifteen,[6] as well as the taxation of costs to [Pella]."[7]

***District Court Appeal Decision****.* Pella again sought judicial review. In a well-written ruling entered in November 2014, the district court affirmed in part, and reversed and remanded in part.[8] The court upheld the agency rulings on causation and industrial disability. The court also affirmed the commissioner's order for Pella to reimburse the first but not the second IME under section 85.39. As to the commissioner's rulings on Pella's obligation to pay disputed medical expenses and costs, the court reversed and remanded for more detailed findings by the agency consistent with the court's opinion.

Pella now appeals.

---

[6] On page fifteen of the commissioner's 2013 appeal decision, the commissioner found Marshall "entitled to reimbursement for his medical treatment costs associated with the right shoulder." In two paragraphs, the commissioner set out the applicable law on medical expenses before concluding Marshall's "itemized medical expenses are the responsibility" of Pella.

[7] Pella filed a May 2014 application for rehearing, claiming the commissioner erred in ordering reimbursement of the first IME and the commissioner should have more specifically addressed its challenges "to medical expenses and taxation of costs." Pella also argued the commissioner's remand decision exceeded the scope of the district court's remand order because the IME-expense issue "was not properly subject to action by the commissioner on remand." Marshall responded the court's remand order stated the commissioner's remand decision "should also address the issue of the proper assessment of . . . expenses associated with [Marshall's] independent medical evaluations." The commissioner denied Pella's application for rehearing, ruling Pella "is not persuasive that the scope of the remand order of the district court was violated."

[8] The district court entered two identical judicial-review orders in November 2014 docketed under two different case numbers (CVCV047908 and CVCV045506). The duplication is not explained in the record, but this appeal is jointly docketed as CVCV045506 and CVCV047908.

## II. Scope and Standards of Review

Iowa Code chapter 17A governs our review of this workers' compensation appeal. *See Young*, 867 N.W.2d at 841-42. In deciding whether the district court correctly applied the law in its role on judicial review, we apply the standards of Iowa Code section 17A.19(10) to the commissioner's decision. *Id.* at 842. We affirm if our conclusions are the same as the district court; if not, we reverse. *Id.*

## III. Causation

Pella challenges the commissioner's finding of causation related to Marshall's shoulder injury. Medical causation is a question of fact vested by the legislature in the commissioner's discretion. *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011). We are bound by the commissioner's factual determinations if they are supported by "substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(f). Substantial evidence is "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(f)(1).

We do not find evidence "insubstantial merely because different conclusions may be drawn from the evidence." *Pease*, 807 N.W.2d at 845. As an appellate court, our task "is not to determine whether the evidence supports a different finding; rather, our task is to determine whether" there is substantial evidence supporting the findings the commissioner "actually made." *Id.* Thus,

medical causation presents an issue of fact, and we must affirm if the agency's decision is supported by substantial evidence. *See id.*

Pella first contends the commissioner erred in finding the deputy did not make findings of credibility, arguing the deputy's "ultimate conclusion" implicitly includes a finding by the deputy discrediting the Marshalls' testimony. But Pella cites no Iowa case equating a deputy's ultimate conclusion with a specific credibility finding based on his or her personal observation of witness demeanor at the arbitration hearing. *See* Iowa Code § 17A.19(10)(f)(3) (defining record as a whole to include credibility findings by the deputy "who personally observed the demeanor of the witnesses"). The commissioner correctly determined: "The presiding deputy made no credibility findings based upon any witness demeanor." Additionally, the commissioner is responsible for weighing the evidence and determining the credibility of witnesses as a de novo trier of fact. *Pease*, 807 N.W.2d at 845. Specifically, "the determination of whether to accept or reject an expert opinion is within the 'peculiar province' of the commissioner." *Id.* (citation omitted).

The commissioner determined, with adequate support, the fact Marshall's shoulder symptoms waxed and waned did not precluded a finding of causation. The commissioner also determined, with adequate support, the fact Marshall's pain level varied with physical therapy and medication did not preclude a finding of causation. Dr. Galles's initial opinion and the credible testimony of Marshall and his wife support these findings. We also find supporting evidence in Marshall's prior medical history showing an absence of right-shoulder problems before the work incident. Because the commissioner specifically found credible

the testimony regarding ongoing pain given by Marshall and his wife, the commissioner logically gave more weight to the medical opinions based on those pain reports in the initial assessments by Dr. Neff and Dr. Galles. Finally, the unwavering expert opinions of Dr. Vande Zande and Dr. Epp bolster the causation finding.

As is common in the workers' compensation arena, the commissioner encountered a "battle of the experts" in Marshall's case. Pella contends a causation finding should be rejected based on the reconsidered opinions of Dr. Neff and Dr. Galles, as well as the views of Dr. Thurston. But ultimately, Pella's complaints only go to the credibility of the medical experts and the weight of their opinions. Longstanding authority vests the commissioner with the role of deciding the weight to be given expert medical testimony. *See Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 853 (Iowa 1995). Our job is not to reweigh the evidence, but to determine whether substantial evidence supports the causation finding the commissioner actually made. *See Pease*, 807 N.W.2d at 845 (stating the main issue is the "extent to which expert testimony constitutes substantial evidence" and concluding substantial evidence supported the commissioner's causation findings where experts for the parties gave conflicting opinions regarding causation and the commissioner found the workers' experts more credible). Like the district court, we conclude substantial evidence supports the commissioner's remand decision. We affirm on this issue.

## IV. Industrial Disability

Marshall claimed an unscheduled loss due to permanent partial disability. Dr. Epp, an occupational doctor, found Marshall had a two-percent-whole-person impairment as a result of the right-shoulder injury. Pella does not dispute the rating of a permanent partial disability, characterizing it as small.

An employee who suffers a "permanent disability" is entitled to compensation. Iowa Code § 85.34. Because Marshall claimed an unscheduled loss, the commissioner was charged with determining Marshall's industrial disability, if any. *See Clark v. Vicorp Rests., Inc.*, 696 N.W.2d 596, 605 (Iowa 2005). Industrial disability measures Marshall's lost earning capacity in the competitive labor market. *See id.* The commissioner was required to consider several factors, including Marshall's "functional impairment, age, education, work experience, qualifications, ability to engage in similar employment, and adaptability to retraining to the extent that any factor affects the employee's prospects for relocation in the job market." *See id.* The commissioner could also factor in Marshall's personal characteristics affecting his employability. *See Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 526 (Iowa 2012).

Dr. Epp restricted Marshall's lifting, pushing, pulling, and carrying. These restrictions are consistent with Marshall's testimony he could not "lift up very much" and had lost strength in his right shoulder after surgery. Marshall testified he was in pain until the time of the surgery, and after surgery, he still had pain. The FCE also restricted Marshall's physical activities. The commissioner determined an industrial disability of twenty percent to the body as a whole, stating:

> [Marshall] is an older worker, but the evidence is quite clear that he has the residual functional ability to perform work both for Pella as well as the Knoxville hospital. [Marshall] has minimal functional impairment and minimal activity restrictions beyond being careful not to perform too strenuous of activity. [He] clearly has a limited educational background and difficulty with reading and therefore retraining into any non-physical labor position is highly unlikely. [Marshall] has had surgical repair of both shoulders and therefore it is quite likely that he has sustained some level of loss of earning capacity as indicated by functional impairment ratings and prophylactic restrictions.

On appeal, Pella challenges the award, claiming because Marshall had relatively minimal restrictions, performed his job until the time of his retirement, had retired from the job market, and was given a small rating, he thus had no loss of access to the competitive labor market or loss of earning capacity.

This issue presents a mixed question of law and fact. *Thorson*, 763 N.W.2d at 856. The commissioner's "determination of industrial disability required [him] to apply established law (the factors considered in determining whether an industrial disability occurred) to the facts." *Id.* Because Pella's challenge to the commissioner's determination of industrial disability "is a challenge to the agency's application of law to the facts, we review this issue under the 'irrational, illogical, or wholly unjustifiable' standard." *Id.* at 856-57 (citation omitted).

We agree with the district court's conclusion that Marshall's voluntary retirement and his act of working without restriction for a time after the injury are factors to consider, but those factors "are not alone determinative on the issue of industrial disability." *See Flexsteel Indus., Inc. v. Scholl*, Nos. 0-250, 99-1006, 2000 WL 1288900, at *3 (Iowa Ct. App. Sept. 13, 2000) (finding employee's return to work and post-injury retirement for unrelated reasons are only two of

many relevant factors to consider in determining industrial disability and the employer's argument based on those factors incorrectly focused on the worker's actual earnings); *see also Thorson*, 763 N.W.2d at 856-57 (recognizing the fact an employee is able to continue at his or her job does not prove the employee has suffered no loss of earning capacity).

In determining Marshall's industrial disability of twenty percent, the commissioner considered Marshall's two percent, modest functional impairment, as well as other relevant factors including his advanced age, his formal education ending after seventh grade, his reading deficiencies, his manual-labor work experience, and the unlikelihood of successful retraining. The commissioner relied on facts supported by substantial evidence and concluded Marshall's competitive position in the job market and overall ability to earn was somewhat diminished as a result of his work injury. In our review, "we recognize that the commissioner is routinely called upon to make such assessments and has a special expertise in the area that is entitled to respect" by reviewing courts. *Neal*, 814 N.W.2d at 527. Because we cannot say the commissioner's resolution was irrational, illogical, or wholly unjustifiable, we affirm on this issue.

## V. Section 85.27 Medical Expenses and Taxation of Costs

During the district court proceedings, Pella argued and Marshall conceded the commissioner's remand decision "did not provide an appropriate accounting of which bills and costs are payable." The district court ruled:

> Besides determining [Pella] is responsible for paying Dr. Epp's first examination as an IME under Iowa Code section 85.39, the commissioner has again failed to provide any sort of detailed accounting allowing the parties to discern which bills are payable under which statutes. The case is therefore remanded to the

agency to make findings on costs and medical expenses consistent with this opinion.

We read the district court's use of the term "besides" as affirming the commissioner's comprehensive analysis of the IME reimbursement in his remand decision. The commissioner's analysis cited case law and statutory authorities, explained why the conditions precedent in section 85.39 had been met, affirmed the deputy's IME ruling, and ordered reimbursement for the first IME but not the second IME by Dr. Epp. *See Young*, 867 N.W.2d at 843-47 (discussing conditions precedent to reimbursement of an IME). The district court ordered a second remand for the commissioner to provide a more detailed accounting and discussion of the remaining disputed medical expenses and additional discussion to resolve whether the entire FCE expense is properly taxed as a "report" cost under rule 876—4.33(6). The court ordered the commissioner to provide supporting authority for any order requiring Pella to pay those previously disputed items. As with the first two appellate issues, we agree with the district court and affirm on this issue.

## VI. Conclusion

We reach the same conclusions as the district court—affirming the commissioner's decision on causation, industrial disability, and reimbursement of first IME, but reversing and remanding to the commissioner on the disputed medical expenses and costs. Accordingly, we remand the case to the district court to further remand to the commissioner for further proceedings consistent with this opinion.

**AFFIRMED AND REMANDED.**